Alexander DICK and Irene
Dick, Plaintiffs,

v.

WATONWAN COUNTY, Tri-County Human Services Board, and Mr. Bill Schutt, its Supervisor of Human Services, Ms. Deborah Hunter, Mental Health Worker, Mr. Jerry Ruppert, title unknown, and John Doe and Mary Roe, whose true names and titles are unknown, Defendants.

No. CIV 4–82–116.

United States District Court,
D. Minnesota,
Fourth Division.

April 11, 1983.

Jerome S. Rice, Gregory T. Spalj, Minneapolis, Minn., for plaintiffs.

Jack M. Fribley, G. Allan Cunningham, Faegre & Benson, Minneapolis, Minn., and William D. Flaskamp and Douglas J. Muirhead, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Minneapolis, Minn., for defendant Watonwan County.

James B. Wallace, C. Allen Dosland, Gislason, Dosland, Hunter & Malecki, New Ulm, Minn., for defendants Tri-County Human Services Board, Bill Schutt, Deborah Hunter, and Jerry Ruppert.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on the defendants' alternative motions to amend the judgment, for judgment notwithstanding the verdict, or for a new trial, and the plaintiffs' motion for attorneys' fees and costs. The plaintiffs claimed a violation of their constitutional rights stemming from their involuntary confinement to detoxification centers for a period of three days. After a nine day trial, the jury found each of the defendants liable and assessed compensatory damages in the aggregate amount of $1 million and punitive damages in the aggregate amount of $12,000.

## FACTS

This case is a study in the abuse of governmental power. On December 5, 1980, as Alexander and Irene Dick, husband and wife, were preparing to leave their home in St. James, Minnesota, for a company Christmas party, a group of uniformed sheriff's deputies appeared at their door bearing orders for their immediate arrest and confinement to detoxification centers. The Dicks, recent immigrants from Scotland, were not intoxicated when they were arrested, nor had they been drinking that day. The Dicks had received no notice of any proceedings against them prior to being served with the orders.

The orders had been issued without a hearing by Watonwan County Court Judge David R. Teigum and were based on petitions for judicial commitment drafted by Watonwan County Attorney Daniel Birkholz and signed by defendant Deborah

Hunter, then a mental health worker for the defendant Tri-County Human Services Board (Tri-County Board).

The only grounds for commitment listed in the petitions were statements made by the Dicks' 15-year-old daughter Valerie to Hunter and defendant Jerry Ruppert, then a chemical dependency counselor, employed by the Tri-County Board. Valerie, a ninth grader at the time of the incident who had turned 15 just three weeks earlier, had been referred to Hunter by her school guidance counselor after Valerie had expressed an interest in obtaining foster care. Hunter and Ruppert met with Valerie and discussed with her the problems she said she was having at home. Although Valerie admitted to Hunter and Ruppert that her parents had never abused or neglected her, she insisted that she wanted to be placed in a foster home. At trial, Valerie testified that her motive for obtaining foster care was so that she would be able to "get away with a lot more," such as staying out late at night. During the course of her conversation with Hunter and Ruppert, Valerie told the defendants that her parents drank too much, were endangering their health by drinking, were sometimes physically abusive toward one another, and that her father sometimes drove after drinking. Valerie also recounted having heard of an incident on October 31, 1980, in which her mother allegedly threatened her father with a knife. Finally, she mentioned that her parents were planning to attend a Christmas party that evening.

Without attempting to verify any of Valerie's statements about her parents, and without waiting to consult with their supervisor, defendant William Schutt, who was unavailable at the time, Hunter and Ruppert went to the office of County Attorney Birkholz that same day, December 5, 1980, for the purpose of obtaining commitment petitions against the Dicks. Hunter and Ruppert met with Birkholz and relayed Valerie's statements to him.

Like Hunter and Ruppert, Birkholz made no attempt to verify any of Valerie's statements. The only "confirmation" he sought

was to have Valerie brought to his office to repeat her accusations against her parents. At no time did Birkholz, Hunter, or Ruppert attempt to contact the Dicks' 35-year-old daughter Irene Young, also a resident of St. James, to determine if Valerie's statements were true, even though they knew that Irene and her husband lived in St. James and had frequent contact with the Dicks. Hunter and Birkholz testified that they did not contact Irene Young because Valerie asked them not to. The defendants also did not attempt to contact other people who could have provided information about the Dicks such as their employers, physician, or minister. Instead they relied exclusively on Valerie's version of the facts even though both Hunter and Ruppert admittedly were aware that young children sometimes "stretch the truth" in order to get into foster homes.

Based on Valerie's statements, Birkholz, Hunter, and Ruppert jointly decided not only to place Valerie in foster care, but also to seek the Dicks' commitment to detoxification centers. The initial suggestion to confine the Dicks was made by Ruppert, a recovering alcoholic himself who five years earlier had been committed for extended alcoholism treatment. The decision to seek the Dicks' immediate confinement was based on Valerie's statement that her parents were planning to attend a Christmas party that evening. Birkholz, Hunter, and Ruppert wanted to prevent the Dicks from attending the party because of their alleged fear that Alexander Dick might become intoxicated at the party and afterwards attempt to drive. The three officials never considered any alternatives short of immediate confinement to avoid this supposed threat.

That same afternoon, Birkholz had commitment petitions drawn up for both of the Dicks. A dependency petition for Valerie was also prepared. The petition for commitment of Alexander Dick stated:

7. Patient is believed to be inebriate because[:] Petitioner has been informed of the following facts by Valerie Dick and believes them to be true. That as

long as Valerie Dick can remember, her father has been consuming alcohol to excess. That patient drinks to the point of intoxication and passes out on the average of 5 out of 7 nights per week. That patient after he has been drinking, he becomes very vulgar, profane and abusive with other family members. That patient also becomes violent and has, on occasion, becomes [sic] physically abusive towards his wife. That patient is dangerous to other [sic] on account of his violent behavior and he also drives a car when he is intoxicated.

The petition for commitment of Irene Dick stated:

7. Patient is believed to be inebriate because[:] Petitioner has been informed of the following facts by Valerie Dick and believes them to be true. That as long as Valerie Dick can remember, her mother has been consuming alcohol to excess. That patient drinks to the point of intoxication. That when patient has been drinking alcohol she commonly becomes physically ill and throws up, and at times expells [sic] blood. That patient becomes violent when she has been drinking to excess, and within the last several weeks patient, with a knife in her hand, threatened to stab her husband and the police were called to settle the dispute of the two drinking parents. That the patient is physically unable to care for herself when she becomes ill and is endangering her physical well-being with the protracted, excessive use of alcohol. That the patient is also on medication and should not be using alcohol to excess.

These petitions were riddled with inaccuracies. The most glaring inaccuracy was the statement in Irene Dick's petition that "within the last several weeks, patient, with a knife in her hand, threatened to stab her husband and the police were called to settle the dispute of the two drinking parents." Alexander Dick did summon police officer Larry Bohm to the Dick home on October 31, 1980, for assistance in quieting Irene Dick who had had too much to drink. But Bohm testified that neither of the Dicks

were violent on that occasion, and that Alexander Dick was not intoxicated. Although Irene Dick used the words "I'll murder him" with reference to her husband,[1] Bohm regarded the statement as a venting of frustrations rather than as a serious threat. At no time did Irene Dick have a knife or any other weapon in her hand. Renee Snyder, a Tri-County Board social worker, was also called to the Dick home that night. She also testified that the Dicks were not violent and characterized her role that evening as that of "tucking the Dicks into bed." Hunter and Ruppert knew of the October 31 domestic dispute and had access to Snyder's written report of the incident.[2] Nevertheless, they included in the petition Valerie's statement to them that she had heard that her mother had threatened her father with a knife as if the statement were true, failing to even note on the petition that the statement was not based on Valerie's personal knowledge. The defendants never attempted to contact Snyder or Bohm, the only people who were actually present on the night in question, to see if Valerie's secondhand account was true.

The petition's reference to Irene Dick's vomiting blood was also inaccurate. Mrs. Dick testified that she had coughed up blood on one occasion but that it was related to a hernia operation and had nothing to do with drinking. The statement that Irene Dick was "on medication and should not be drinking to excess" was, like the other statements, based solely on the word of Valerie, a 15-year-old child. No attempt was made to confirm these statements with the Dicks' physician.

The statement that Alexander Dick "drives a car when he is intoxicated" was a mischaracterization in that Valerie had stated only that her father sometimes drove after drinking. No one attempted to verify the statement by checking Alexander Dick's driving record which, in fact, was unblemished. Moreover, to the extent that the threat that Alexander Dick might become intoxicated at the Christmas party that evening and attempt to drive was the basis for the defendants' belief that he was dangerous and needed to be immediately confined, the defendants were tragically mistaken. Unknown to Hunter, Ruppert, or Birkholz, none of whom bothered to check into the matter, the Dicks had already arranged for their son-in-law to drive them to and from the Christmas party that evening.

After the commitment petitions were prepared, they were filed with the clerk of county court and presented to Judge Teigum who, that same afternoon, issued "hold" orders for the Dicks' immediate arrest and confinement. These orders were issued without a hearing and without notice to the Dicks of the charges against them. Judge Teigum had no information before him other than that contained in the commitment petitions prepared by Birkholz, Hunter, and Ruppert which in turn relied entirely on the statements of a 15-year-old child.

On the basis of the hold orders, the Dicks were arrested at their home by a group of five or six police officers and sheriff's deputies who arrived in three marked squad cars and one unmarked car. Although stunned by their arrest, the Dicks, neither of whom had ever before been arrested, complied with the orders peacefully.

The Dicks were transported in marked police cars to separate detoxification centers one of which was located in Heron Lake, Minnesota, approximately 30 miles southwest of St. James, and the other of which was located in Fairmont, Minnesota,

---

1. Testimony revealed that the phrase "I'll murder him" is a common expression in Scotland much as "I could kill him" is used in the United States.

2. In fact, shortly after the October 31 incident, Ruppert telephoned Irene Dick to offer the Dicks alcohol counseling. The Dicks declined Ruppert's offer. Ruppert interpreted the Dicks' refusal to accept counseling as a symptom of alcoholism. In his deposition, Ruppert testified that, since the Dicks had refused counseling, he and Hunter decided "the only way that we would be able to get them through treatment was through commitment." Deposition of Jerry Ruppert, Apr. 7, 1982, at 51. This deposition testimony was read to the jury.

approximately 30 miles southeast of St. James. They were confined at the detoxification centers without a hearing and against their will from the evening of Friday, December 5, 1980, to Monday, December 8, 1980. The conditions at the detoxification center to which Alexander Dick was confined were deplorable. The building was dirty, dilapidated, and reeked of sewage. Mr. Dick, who has an artificial leg, was given ill-fitting crutches and hospital slippers which restricted his movement and caused him considerable embarrassment. His room contained a camping cot, but no bed. The physical conditions at the detoxification center to which Irene Dick was confined were much better. However, during her confinement she was visited by defendant Ruppert who threatened her with confinement to a far less desirable institution unless she would agree to voluntarily commit herself for treatment.

On Monday morning, the Dicks were taken to the county courthouse for a probable cause hearing. Pursuant to a stipulation of the parties, the hearing was continued for six months on the condition that the Dicks attend alcohol counseling sessions. The Dicks attended two sessions but were never contacted about further sessions. On June 12, 1981, the county dismissed its case against the Dicks.

The Dicks brought suit under 42 U.S.C. § 1983 alleging a deprivation of their liberty without due process of law.[3] They alleged that defendants Hunter and Ruppert were grossly negligent in failing to investigate and verify Valerie's accusations against her parents before seeking the Dicks' confinement, and that Hunter and Ruppert acted in willful disregard of the Dicks' constitutional rights. Defendant William Schutt, who was the supervisor of the Tri-County Human Services Depart-

ment, an agency of the Tri-County Board, but who did not participate in the procurement of the arrest and confinement orders, was accused of failing to properly train and supervise Hunter and Ruppert. County liability was predicated on the claim that the individual defendants acted in accordance with a custom or policy of the county.

The jury found that Alexander and Irene Dick had been deprived of their liberty without due process of law and that the acts and omissions of the individual defendants were a proximate cause of that deprivation. The jury further found that Schutt had failed to properly train or supervise Hunter and Ruppert and that his failure was part of a custom or policy of the Tri-County Board. The jury was not asked to decide whether Hunter's and Ruppert's acts and omissions were in accordance with county custom or policy because the Court ruled as a matter of law during the trial, based upon the testimony of defendant Schutt, that Hunter's and Ruppert's actions in seeking to initiate commitment proceedings against the Dicks based on unverified information from a minor child were in accordance with a county policy established by Schutt. On the issue of the individual defendants' qualified immunity, the jury found that Schutt had acted in good faith but that Hunter and Ruppert had not. The jury awarded Alexander and Irene Dick each $500,000 in compensatory damages, and assessed punitive damages against Schutt in the amount of $2,000 and against Hunter and Ruppert each in the amount of $5,000.

## MINNESOTA JUDICIAL COMMITMENT LAW

The Dicks' arrest and confinement was carried out under color of the Minnesota Judicial Commitment statute, Minn.Stat. § 253A.07, subd. 3 (1980), *repealed by* Min-

---

**3.** The Dicks' complaint also contained state claims for false arrest, false imprisonment, and malicious prosecution. The Court granted the defendants' motion for a directed verdict on these claims at the close of the plaintiffs' presentation of their case.

Prior to trial the Court granted motions for summary judgment in favor of several other

defendants in the case—County Attorney Daniel Birkholz who drafted the commitment petitions, Sheriff V.H. Engdahl who executed the hold orders, and Maureen McCarthy, Valerie Dick's school guidance counselor—on grounds of governmental immunity. The Court's memorandum and order is reported at 551 F.Supp. 983 (D.Minn.1982).

nesota Commitment Act of 1982, 1982 Minn. Laws ch. 581 (codified at Minn.Stat. §§ 253B.01–253B.23 (1982)). This law, which was repealed in 1982,[4] authorized the temporary commitment of "inebriate persons" without a hearing. "Inebriate person" was defined by the statute as follows:

> "Inebriate person" means any person determined as being incapable of managing himself or his affairs by reason of the habitual and excessive use of intoxicating liquors, narcotics, or other drugs. For the purpose of involuntary commitment of a person as inebriate it is necessary for the court to find: (a) that the person is an inebriate person, and (b) that involuntary hospitalization is necessary for the welfare of the person or the protection of society . . . .

Minn.Stat. § 253A.02, subd. 4.

Minn.Stat. § 253A.07, subd. 1, set out the petitioning procedures to be followed for the initiation of commitment proceedings against an individual:

> Any interested person may file in the probate court of the county of the proposed patient's settlement or presence a petition for commitment of a proposed patient, setting forth the name and address of. the proposed patient, the name and address of his nearest relatives, and the reasons for the petition. Such petition shall be accompanied either by a written statement by a licensed physician stating that he has examined the proposed patient and is of the opinion that the proposed patient may be mentally ill, mentally deficient, or inebriate, and should be hospitalized, or by a written statement by the petitioner that, after reasonable effort, the petitioner has been unable to obtain an examination by a licensed physician or that an examination could not be performed. Before filing, a copy of the petition shall be delivered by the petitioner to the designated agency.

Ordinarily, after the filing of a petition, the probate court would appoint qualified examiners to conduct an examination of the patient, prior to any confinement, and to submit a report to the court. Minn.Stat. § 253A.07, subd. 2. The court would also require the county welfare agency to investigate the proposed patient's family and financial background and report to the court. Minn.Stat. § 253A.07, subd. 7. Finally, the proposed patient, represented by counsel, would be given a hearing to determine whether he or she could be committed. Minn.Stat. § 253A.07, subd. 8.

Under certain limited circumstances, however, the statute allowed a probate judge to forego these procedural safeguards and to issue a temporary hold order directing a health or peace officer to take the proposed patient into custody and to confine the patient in a hospital:

> The court may direct a health or peace officer or any other person to take the proposed patient into custody and trans-

---

4. In August of 1982, the Minnesota Legislature repealed the entire chapter of statutes relating to the hospitalization and commitment of mentally ill, mentally deficient, and inebriate persons; i.e., Minn.Stat. §§ 253A.01–.23 (1980). In its place, the Legislature enacted the Minnesota Commitment Act of 1982, 1982 Minn.Laws ch. 581 (codified at Minn.Stat. §§ 253B.01–.23 (1982)). See generally Janus and Wolfson, The Minnesota Commitment Act of 1982: Summary and Analysis, 6 Hamline L.Rev. 41 (1983).

Like the old law, the new law provides for the temporary, prehearing confinement of mentally ill, mentally retarded, or chemically dependent persons. However, the standard of dangerousness which must be met before a person can be confined on a prehearing basis is much higher under the new law. The petitioning party must make a "particularized showing . . . that serious imminent physical harm to the proposed patient or others is likely unless the proposed patient is apprehended . . . ." Minn. Stat. § 253B.07, subd. 6 (1982). Formerly, commitment of an inebriate person was possible when "necessary for the welfare of the patient or the protection of society." Minn. Stat. § 253A.07, subd. 17(d) (1980) (repealed 1982); see State ex rel. Doe v. Madonna, 295 N.W.2d 356, 363 (Minn.1980). The new law also contains procedural safeguards such as mandatory pre-petition screening, Minn.Stat. § 253B.07, subd. 1 (1982), and prehearing examination, Minn.Stat. § 253B.07, subds. 4, 5 (1982), which should greatly reduce the risk of future wrongful confinements. Under the new law, the use of temporary hold orders is to be reserved for exceptional cases. Janus and Wolfson, The Minnesota Commitment Act of 1982: Summary and Analysis, 6 Hamline L.Rev. 41, 70 (1983).

port him to a public hospital, private hospital consenting to receive him, public health facility, or other institution, for observation, evaluation, diagnosis, emergency treatment, care, and if necessary, confinement. The order of the court may be executed on any day and at any time thereof, by the use of all necessary means including the breaking open of any place in which the proposed patient is located and the imposition of necessary restraint upon the person of such proposed patient. Unless otherwise ordered by the court, a peace officer taking the proposed patient into custody pursuant to this subdivision shall not be in uniform and shall not use a motor vehicle visibly marked as a police vehicle.

Minn.Stat. § 253A.07, subd. 3. This procedure was used to confine the Dicks.

The limited circumstances under which a probate judge could issue a hold order were set out by the Minnesota Supreme Court just six months prior to the Dicks' confinement. In *State ex rel. Doe v. Madonna,* 295 N.W.2d 356 (Minn.1980), the plaintiff, suing on behalf of alleged mentally ill persons confined pursuant to hold orders, challenged the Minnesota Judicial Commitment statute on due process grounds.[5] The court found that the statute had been unconstitutionally applied to the named plaintiffs because they had not received a hearing within 72 hours after being confined. But the court struggled to uphold the facial constitutionality of the statute by implying two requirements. First, the court required that the probate court make a finding of "probable dangerousness" before issuing a hold order.[6] *Madonna,* 295 N.W.2d at 363. Second, the court required that an individual confined pursuant to a hold order be given a hearing within 72 hours rather than 5 to 44 days as provided in the statute. *Madonna,* 295 N.W.2d at 365. The Supreme Court was also careful to point out that the agency involved in *Madonna,* the Hennepin County Welfare Department, uses a "complex, careful screening procedure . . . which corroborates the information on petitions where possible and explores all reasonable alternatives to commitment." *Madonna,* 295 N.W.2d at 362 n. 8; *cf. Welsch v. Likins,* 373 F.Supp. 487, 502 (D.Minn.1974) (due process requires that state officials make good faith effort to place civilly committed persons in appropriate settings least restrictive of their liberties).

The Dicks did not challenge the facial validity of Minnesota's Judicial Commitment statute, and, in fact, the jury was instructed that the statute, if followed, satisfied due process requirements. Court's Instruction No. 17. The central issues at trial were whether the individual defendants complied with the statute and whether their actions in seeking the Dicks' confinement were reasonable.

Measured against the procedures mandated or contemplated in *Madonna,* the procedures used by Hunter and Ruppert were woefully inadequate. In addition to failing to investigate Valerie's accusations against her parents and failing to consider customary alternatives to confining the Dicks, such as arranging a noncustodial alcohol confrontation session,[7] defendants Hunter and Ruppert did not comply with the judicial commitment statute in one important respect. The statute required the petitioning party to file either a written statement by a licensed physician giving the physician's

---

**5.** Although the challenge in *Madonna* was to the statute's provisions authorizing commitment of mentally ill persons, the court discussed the provisions relating to inebriate persons as well. *See, e.g.,* 295 N.W.2d at 363.

**6.** Neither of the hold orders for the Dicks' confinement included a finding of probable dangerousness. However, under *Madonna,* such a finding need not be explicit, but can be inferred from the action taken; *i.e.,* commitment. *See Madonna,* 295 N.W.2d at 364.

**7.** As described by defendant Ruppert, an alcohol confrontation session involves arranging a meeting between a suspected alcoholic and his or her family members, employer, or other supportive people in an effort to get the person to realize that he or she has an alcohol problem. Ruppert testified that confrontation sessions are used in approximately 25 percent of the cases involving suspected inebriates.

opinion that the proposed patient is inebriate or a written statement that the petitioner "after reasonable effort" could not obtain an examination by a physician. Minn.Stat. § 253A.07, subd. 1. The defendants did not obtain physician's statements. Instead, both commitment petitions state that "Petitioner is unable to procure a physician's statement because Petitioner is unaware of any physician who is sufficiently knowledgeable with the drinking habits of the patient." But, as the testimony at trial revealed, the defendants' only effort to determine the name of the Dicks' physician consisted of asking Valerie who told them she did not know. They did not attempt to contact the Dicks' adult daughter, Irene Young, to see if she could provide the physician's name. Even if the defendants could not have located the Dicks' personal physician, they could have attempted to have the Dicks examined by a different physician. The defendants rejected this possibility, however, because they wanted to obtain hold orders in time to prevent the Dicks from attending the Christmas party that evening.

Hunter's and Ruppert's failure to make a reasonable effort to obtain physician's statements as required by the statute was a serious omission which contributed greatly to the Dicks' wrongful confinement. Given the statutory definition of inebriacy—an inability to manage oneself or one's affairs, Minn.Stat. § 253A.02, subd. 4—it is extremely unlikely that a physician, after examining the Dicks in person, would have concluded that they were inebriates in need of hospitalization. Both of the Dicks were employed at the time—Alexander Dick as a precision instrument engraver and Irene Dick as a nurse's aide. Both had excellent work records with no problem of absenteeism that might suggest an alcohol problem. At the very least, an examination by a physician would have given the Dicks notice of the accusations against them and an opportunity to respond to the numerous inaccuracies contained in the commitment petitions.

The defendants' failure to comply with the judicial commitment statute, failure to investigate and verify Valerie's accusations, and failure to consider alternatives to immediate confinement resulted in the Dicks' incarceration in detoxification centers. In the unanimous judgment of the jury, the defendants' actions and omissions were unreasonable and deprived the Dicks of their constitutional rights.

DISCUSSION

A. *Motion to Amend the Judgment*

The first issue before the Court is defendant Watonwan County's motion to amend the judgment pursuant to Federal Rule of Civil Procedure 59(e) to eliminate the liability of Watonwan County.

It is important to distinguish between the two governmental defendants in this case— Watonwan County and the Tri-County Board. The Tri-County Board is an entity created by a contract among Watonwan, Faribault, and Martin counties pursuant to the Minnesota Human Services Act, Minn. Stat. §§ 402.01–402.10 (1980). That statute permits one or more contiguous counties to designate a human services board to provide welfare, corrections, and other social services for the participating county or counties. Minn.Stat. §§ 402.01, subd. 1, 402.02, subd. 2(d). The Tri-County Board operates the Tri-County Human Services Department, of which defendant Schutt was the supervisor during the period in question.[8] Watonwan County is the county of the plaintiffs' residence and the county in which the Tri-County Human Services Department is located. Schutt, Hunter, and Ruppert provided social services only within Watonwan County.

The issue of Watonwan County's liability was not submitted to the jury because the Court ruled during the trial that Watonwan County would be liable, as a matter of law, for any liability incurred by the Tri-County Board. The issue of the Tri-County Board's

---

**8.** Schutt testified that his official title was "Chemical Dependency Coordinator." Hunter and Ruppert each testified that Schutt was the supervisor of the Tri-County Human Services Department.

liability for the acts and omissions of defendant Schutt was submitted to the jury, and the jury found the board liable on the basis of the existence of a governmental policy or custom. *See* Special Verdict Answer 3.C. The Tri-County Board is also liable for the acts and omissions of defendants Hunter and Ruppert because the Court ruled during the trial that Hunter and Ruppert acted in accordance with a policy of the Tri-County Board. *See* part B.3. *infra.*

Watonwan County now renews its contention that the individual defendants, Schutt, Hunter, and Ruppert were all employees of the Tri-County Board, not of Watonwan County, that the two entities are legally distinct, and that the county therefore can incur no liability for the acts or omissions of the Tri-County Board's personnel.

Several facts are relevant in evaluating the county's argument. The plaintiffs' initial and amended complaints both named the "Watonwan County Welfare Department" as a defendant, not the Tri-County Board. The Tri-County Board answered in the name of the Watonwan County Welfare Department and its pretrial motion briefs consistently used that designation. Prior to trial, the Tri-County Board never denied that Schutt, Hunter, and Ruppert were employees of Watonwan County. At the outset of the trial, it became clear that the proper name of the agency was the Tri-County Human Services Board and the case name and special verdict form were duly amended to reflect that fact. However, the Court never departed from its earlier ruling that Watonwan County is liable for any liability incurred by the Tri-County Board and declines to do so now.

■ The Court is convinced that, by authorizing contiguous counties to pool their resources in the formation of human serv-ices boards, the Minnesota Legislature never intended to absolve the participating counties of liability for wrongs committed by such boards or by their personnel. This conclusion is based on several considerations.

The Human Services Act consistently refers to the authority granted to contiguous counties to "designate" a human services board. Minn.Stat. §§ 402.01, subd. 1, 402.-01, subd. 3. The use of the word "designate" rather than "create" or "establish" strongly suggests that while counties may agree to delegate their social services functions to a human services board, the board does not thereby become a wholly separate entity. To the contrary, the statute ensures that firm connections between the participating counties and the board will be maintained. The human services board is funded exclusively by the counties,[9] Minn.Stat. § 402.02, subd. 3, and the county commissioners of each participating county must approve the board's budget, Minn.Stat. § 402.065. At least one county commissioner from each participating county must sit on the board. Minn.Stat. § 402.02, subd. 1(a). In the instant case, the document setting up the Tri-County Board goes a step further and provides for review of "[a]ll policy, administrative, staffing and budgetary decisions of the [Tri-County] Board" by the boards of commissioners of the participating counties. Tri-County Human Services Board exhibit Q at 3.

■ Significantly, in the situation where a single county designates a human services board, the statute provides that the county's own board of commissioners may assume the powers and duties of the human services board. Minn.Stat. § 402.02, subd. 1a. In such a case, the county clearly would be liable for the wrongs of its human services board (provided, of course, that the

---

**9.** This factor makes the issue of Watonwan County's liability largely academic. Even if the county were not held liable in its own right, it would become responsible for the Tri-County Board's liability to the extent the amount of that liability exceeds the Tri-County Board's insurance coverage. Of course, in that event, Faribault and Martin counties, which were not defendants in this suit, presumably would also share in the Tri-County Board's liability. But by entering judgment against Watonwan County, which has its own separate insurance coverage, the Court is not increasing the county's potential exposure since the county will retain the option of seeking contribution from Faribault and Martin counties in a separate action.

requisite custom or policy were shown) since there would be an identity between the county board and the human services board. In the present situation where the relationship between Watonwan County and the Tri-County Board is only slightly more attenuated, the Court sees no reason to disturb its previous ruling that Watonwan County is jointly liable for any liability incurred by the Tri-County Board.[10]

### B. *Judgment Notwithstanding the Verdict*

██ The standard for granting a motion for entry of judgment notwithstanding the verdict is extremely exacting. Such a motion can be granted " 'only where the evidence points *all one way* and is susceptible of *no* reasonable inferences sustaining the position of the nonmoving party.' " *Kayser v. Rockwell Graphic Systems, Inc.,* 666 F.2d 1233, 1235 (8th Cir.1982), *quoting Giordano v. Lee,* 434 F.2d 1227, 1231 (8th Cir.1970) (emphasis in original). The trial court must view the evidence in the light most favorable to the prevailing party and must assume that the jury resolved all conflicts in the evidence in favor of the prevailing party. *Harris v. Pirch,* 677 F.2d 681, 683 (8th Cir.1982). If reasonable minds could differ as to the conclusion to be drawn from the evidence, the court must deny the motion. *Harris,* 677 F.2d at 683. Procedurally, a party must have moved for a directed verdict at the close of all the evidence in order to bring a motion for judgment notwithstanding the verdict, and no grounds not raised in the directed verdict motion may be raised in the motion for judgment notwithstanding the verdict. *Johnson v. Rogers,* 621 F.2d 300, 305 (8th Cir.1980).

All of the defendants have moved for entry of judgment notwithstanding the verdict raising a variety of grounds. These grounds will be considered separately.

### 1. *Deprivation of constitutional rights.*

The defendants' first attack on the judgment consists of the argument that the Dicks' confinement did not rise to the level of a constitutional violation because the defendants complied with the judicial commitment law and obtained court orders authorizing the confinement.

The jury was instructed that "the Minnesota law applicable in this case [*i.e.,* the Minnesota Judicial Commitment statute, Minn.Stat. § 253A.07 (1980) (repealed 1982) ], if followed, meets the requirements of the United States Constitution." Court's Instruction No. 17. Therefore, the first issue is whether the defendants followed the law.

██ The Court has already discussed the defendants' noncompliance with the judicial commitment law. Hunter and Ruppert did not procure, nor did they make a reasonable effort to procure, physician's statements as required by law. Minn.Stat. § 253A.07, subd. 1. They also did not investigate Valerie's accusations against her parents even though they knew that Valerie's desire to be placed in foster care gave her a motive to exaggerate, or consider alternatives to confinement as contemplated in *State ex rel. Doe v. Madonna,* 295 N.W.2d 356, 362 n. 8. As detailed above, Hunter and Ruppert's failure to make any attempt to procure physician's statements combined with their overzealous effort to obtain hold orders in time to prevent the Dicks from attending the Christmas party resulted in the Dicks' wrongful confinement. The Court finds no merit in Hunter and Ruppert's defense that they fully complied with the judicial commitment law.

---

**10.** This ruling does not, contrary to the defendants' suggestion, impose respondeat superior liability on Watonwan County in contravention of *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). As discussed in detail below, *see* part B.3. *infra,* the Tri-County Board's liability in this case is based on the existence of a policy or custom of the Board which was the moving force behind the deprivation of the plaintiffs' constitutional rights. The Court's ruling that Watonwan County is jointly liable for any liability incurred by the Tri-County Board is merely a rejection of the defendants' contention that the Tri-County Board and Watonwan County are legally distinct entities, and a recognition that any policy or custom of the Tri-County Board is *ipso facto* a policy or custom of Watonwan County.

Relying upon the United States Supreme Court's decision in *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), the defendants next argue that there can be no deprivation of constitutional rights where a confinement results from a court order. In *Baker,* the respondent Linnie McCollan had been arrested pursuant to a facially valid warrant and confined in a county jail for several days despite his continued protestations of mistaken identity. In fact, the warrant was intended not for Linnie, but for his brother Leonard. However, the warrant bore Linnie's name because Leonard had previously been arrested while masquerading as Linnie and had shown the police an altered driver's license bearing Linnie's name. Not until Linnie had been confined in county jail for several days did the defendant Sheriff Baker finally compare Linnie's appearance with a file photograph and fingerprints of the wanted person, and, recognizing the error, authorize Linnie's release. McCollan brought suit against the sheriff and his surety under 42 U.S.C. § 1983. The district court directed a verdict for the defendants, but the court of appeals reversed.

In a split decision, the Supreme Court reversed the court of appeals, holding that McCollan had not been deprived of any constitutional right by the actions or omissions of the sheriff. Justice Rehnquist's opinion stated:

> [W]e do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent. Nor is the official charged with maintaining custody of the accused named in the warrant required by the Constitution to perform an error-free investigation of such a claim.

*Baker,* 443 U.S. at 145–146, 99 S.Ct. at 2694–2695; *accord Johnson v. City of St. Paul,* 634 F.2d 1146 (8th Cir.1980). In short, the Court held that since all of the sheriff's acts or omissions were in reliance on a facially valid court order, the sheriff could incur no liability for McCollan's wrongful confinement.

The defendants in this case seize upon language in *Baker* which, according to their analysis, bars a section 1983 action for any deprivation of liberty resulting from a facially valid court order. In dictum Justice Rehnquist stated with reference to McCollan's confinement:

> Whatever claims this situation might give rise to under state tort law, we think it gives rise to no claim under the United States Constitution. Respondent was indeed deprived of his liberty for a period of days, but it was pursuant to a warrant conforming, for purposes of our decision, to the requirements of the Fourth Amendment.

443 U.S. at 144, 99 S.Ct. at 2694 (dictum). The defendants contend that since court orders authorized the Dicks' confinement, the Dicks suffered no deprivation of their constitutional rights under *Baker.*

The Court does not read *Baker* so broadly. Rather, *Baker* must be limited to its particular facts—facts which are clearly distinguishable from the facts of the instant case. In *Baker,* the only claimed wrongdoing related to acts and omissions of the sheriff occurring *after* the issuance of the arrest warrant. The sheriff relied on the existence of the court order in failing to promptly investigate McCollan's assertions of innocence. This reliance shielded the sheriff from section 1983 liability. The sheriff's reliance on an existing court order contrasts sharply with the defendants' roles in this case. Hunter and Ruppert did not rely on an existing warrant, but actively sought to procure orders for the Dicks' confinement without a reasonable basis for doing so, failed to comply with the judicial commitment law, and irresponsibly caused inaccurate and highly prejudicial information to be put before the reviewing judge. In cases involving active procurement of various types of court orders as opposed to mere reliance on existing orders, courts both before and since *Baker* have had no difficulty sustaining claims against defendants under section 1983. *Baskin v. Parker,*

602 F.2d 1205, 1208 (5th Cir.1979) (search warrant); *Guerro v. Mulhearn,* 498 F.2d 1249, 1256 (1st Cir.1974) (wiretap order); *Farmer v. Lawson,* 510 F.Supp. 91, 95–96 (N.D.Ga.1981) (search warrant). In cases involving arrest warrants, several courts have suggested that *Baker* is inapplicable when the plaintiff claims wrongdoing in the procurement of the warrant. *Johnson v. Miller,* 680 F.2d 39, 42 (7th Cir.1982) (dictum); *Whitley v. Seibel,* 613 F.2d 682, 686 (7th Cir.1980), *cert. denied,* —— U.S. ——, 103 S.Ct. 254, 74 L.Ed.2d 198 (1982); *cf. Rodriguez v. Ritchey,* 556 F.2d 1185, 1195 (5th Cir.1977) (Hill, J., concurring) (pre-*Baker* opinion), *cert. denied,* 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 799 (1978). Thus, *Baker* does not control this case.

The Court's conclusion that *Baker* does not preclude a section 1983 cause of action based on official misconduct in the procurement of a confinement order is reinforced by Justice Blackmun's concurrence in *Baker.* Justice Blackmun noted that the result in *Baker* might have been different if the conduct of the defendant had risen to the level that "shocks the conscience" or is otherwise "offensive to the concept of ordered liberty." 443 U.S. at 147, 99 S.Ct. at 2696 (Blackmun, J., concurring) (citations omitted). The quoted phrases perfectly describe the defendants' conduct toward the Dicks. The defendants' shocking disregard of the Dicks' civil rights was revealed by the defendants' own testimony as well as the testimony of others, and is no doubt reflected in the size of the jury's award. For example, Ruppert testified that he saw no harm in confining the Dicks for three days because "[t]heir story would be brought out at the hearing." He also told Valerie that committing her parents might be "the best Christmas present" she could give them. Few things could be more offensive to the concept of ordered liberty than the incarceration of two law-abiding citizens for three days based on nothing more than the unverified and inaccurate allegations of a child barely 15 years old.

■ Finally, to read *Baker* as broadly as the defendants request would be to deny victims of the most egregious official misconduct access to a federal forum any time the misconduct culminated in a court order. But it is precisely in such cases that access to the federal courts is most needed. "The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'" *Mitchum v. Foster,* 407 U.S. 225, 242, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705 (1972). "In determining whether or not a specific invasion is of a constitutional magnitude, it is ... appropriate to consider whether the actions of the officials causing that invasion are the type over which federal supervision is needed ...." *Henry v. City of Minneapolis,* 512 F.Supp. 293, 297 (D.Minn.1981). "'Where the States have reasonably effective safeguards or remedies, a restrictive reading of the [Civil Rights] Acts is called for.'" *Id., quoting Sami v. United States,* 617 F.2d 755, 773 (D.C.Cir.1979). In this case, it is clear that the Tri-County Board did not have in place at the time of the Dicks' commitment "reasonably effective safeguards" against erroneous confinement. In fact, the custom and policy of the Tri-County Board was to permit its employees to seek the involuntary commitment of individuals based solely on the unverified accusations of a minor child. *See* part B.3. *infra.* Consequently, section 1983 must be construed broadly in order to redress the wrong suffered by the Dicks.

For all of these reasons, the Court rejects the defendants' argument that the Dicks were not deprived of their constitutional rights.

### 2. *Proximate cause.*

■ Given that the Dicks did suffer a violation of their constitutional rights, the next issue is whether the defendants proximately caused that violation.

The jury specifically found that the acts and omissions of each of the individual defendants proximately caused the violation

of the Dicks' constitutional rights. The defendants now contend that the court orders, not the acts and omissions of Hunter and Ruppert, were the proximate cause of the violation. Further, they maintain that Hunter's and Ruppert's consultation with County Attorney Birkholz broke the chain of causation.

Sound reasons exist for not disturbing the jury's express finding that the individual defendants proximately caused the violation of the Dicks' constitutional rights. The most important consideration is the jury's determination that Hunter and Ruppert did not act in good faith. This finding was amply supported by evidence in the record including Hunter's and Ruppert's own admissions of their failure to make a single attempt to verify any of Valerie's accusations, testimony regarding Hunter's and Ruppert's failure to comply with the judicial commitment law, and testimony concerning Hunter's, Ruppert's, and Birkholz' eagerness to have the Dicks confined in order to prevent them from attending the Christmas party. The shocking and reckless disregard of the Dicks' constitutional rights which marked the defendants' conduct, fully justified the jury's finding that Hunter and Ruppert acted in bad faith.

Where public officials act in bad faith and in reckless disregard of individuals' constitutional rights, this Court is unwilling to allow them to escape liability on the theory that higher officials ratified their conduct. In the leading case on proximate causation in civil rights cases, *Rodriguez v. Ritchey,* 556 F.2d 1185 (5th Cir.1977) (en banc), eight of fourteen judges sitting en banc rejected the argument that an officer who "maliciously or in bad faith seek[s] to obtain an indictment from a grand jury" is insulated from liability. 556 F.2d at 1195 (Hill, J., concurring). Indeed, six of those judges felt that even an officer acting in subjective good faith could still be liable if his or her conduct was not within the "bounds of reason." 556 F.2d at 1207 (Goldberg, J., dissenting). This latter view appears to be the rule embodied in Minneso-

ta tort law. *Survis v. A.Y. McDonald Mfg. Co.,* 224 Minn. 479, 496, 28 N.W.2d 720, 729 (1947) (complainant must use "due diligence" to discover evidence before initiating judicial proceedings against an individual); *Jones v. Flaherty,* 139 Minn. 97, 99, 165 N.W. 963, 964 (1917) (complainant must use "reasonable diligence"); *see also* W. Prosser, The Law of Torts, 843–44 (4th ed. 1971). Under either of these standards—maliciousness or unreasonableness—Hunter's and Ruppert's irresponsible behavior fully supports the jury's findings of liability.

■ The defendants' contention that they did not proximately cause the violation of the Dicks' constitutional rights is defective for another reason as well. While some courts have held that an officer who obtains an arrest warrant for an individual cannot be held liable if the decision to issue the warrant is made by an intermediary agent such as a prosecutor, grand jury, or judge, that defense applies only if the intermediary agent exercises reasonable "independent judgment." *Smiddy v. Varney,* 665 F.2d 261, 266–67 (9th Cir.1981), *cert. denied,* — U.S. —, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982); *Dellums v. Powell,* 566 F.2d 167, 192–93 (D.C.Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *see Ames v. United States,* 600 F.2d 183, 185 (8th Cir.1979). *But see Smith v. Gonzales,* 670 F.2d 522, 526 (5th Cir.), *cert. denied,* — U.S. —, 103 S.Ct. 361, 74 L.Ed.2d 397 (1982) (officer is not liable even if, by wrongful means, he or she taints the independent judgment of the intermediary agent). In this case, neither County Attorney Birkholz nor Judge Teigum exercised the type of independent judgment necessary to insulate the defendants from liability.

Hunter's and Ruppert's conversations with Birkholz did not break the chain of causation because Birkholz himself testified in his deposition that the decision to seek the Dicks' confinement was made jointly with Hunter and Ruppert.[11] Moreover, evi-

---

11. Birkholz testified in his deposition as follows:

dence in the record suggests that Birkholz, as well as Hunter and Ruppert, did not act in good faith. Particularly indicative of Birkholz' state of mind is a conversation he had in March of 1981 with Norbert Smith, an attorney then representing the Dicks. Smith testified that, in response to a question by Smith asking why the Dicks had been put in detoxification centers when they had not been drinking, Birkholz replied that the Dicks "would have gotten drunk [that night] anyway, and . . . this was basically a way to save time and effort." Statements of this nature do not evince the type of independent prosecutorial judgment which must be present in order to break the causal chain.

▬ The Court also finds that Judge Teigum's orders, given the circumstances under which they were procured, did not break the causal chain. It is important to emphasize that there was no hearing at which the Judge could look behind the petitions or assess the credibility of witnesses. In addition, hold orders apparently were issued rather routinely in Watonwan County during the time period in question. Both Birkholz and Schutt testified that they could not recall a single instance in which a petition for commitment was denied. However, the key consideration is the manner in which Hunter and Ruppert obtained the hold orders.

The Eighth Circuit has ruled in *Ames v. United States,* 600 F.2d 183, 185 (8th Cir. 1979), that situations involving "the presentation of false evidence or the withholding of evidence" are exceptions to the general rule that a grand jury indictment, or as in this case, a court order, breaks the chain of causation. *See also* Restatement (Second) of Torts § 653 (1977); W. Prosser, The Law of Torts, 836–37 (4th ed. 1971). Both of these elements are present here. Judge Teigum had no information available to him other than that contained in the commitment petitions signed under oath by Hunter. But, as detailed above, the petitions contained glaring inaccuracies, including the false statement that Irene Dick, while wielding a knife, had recently threatened to murder her husband. This inaccuracy was especially damaging since the Judge was required to make a finding of "probable dangerousness" before ordering the Dicks confined. Of all the statements contained in the petitions, the murder threat is by far the most suggestive of dangerousness. While Hunter and Ruppert may not have known that this statement was false, *Ames* does not expressly require such knowledge. At a minimum, Hunter and Ruppert acted in reckless disregard of whether the statement was true or false. They relied solely on a secondhand account reported by a child barely 15 years old and who they knew had a motive to exaggerate. Even though they could have easily discovered the statement's falsity simply by checking with Renee Snyder, one of their own co-workers, they made no attempt to do so. Hunter and Ruppert were also guilty of withholding evidence in the sense that, although they had a legal duty to make at least a reasonable effort to obtain physician's statements—statements which, if obtained, almost certainly would have exonerated the Dicks—they failed to make any effort to procure the statements

Q Who made the decision for involuntary commitment?

A It was a joint decision by Deborah Hunter, Jerry Ruppert and myself after speaking with the daughter and having her recount these things.

Deposition of Daniel Birkholz, Apr. 8, 1982, at 58. At trial, Birkholz attempted to backtrack from his deposition testimony somewhat:

Q Mr. Birkholz, it's true, is it not, that the decision to petition for involuntary commitment was a joint decision by Deborah Hunter, Jerry Ruppert and yourself after speaking with Valerie and having her recount her story?

A The ultimate decision to prepare and file any petition for judicial commitment is a decision of the County Attorney. Mr. Ruppert and Miss Hunter and I agreed that in this case the request for a petition for judicial commitment of Alexander Dick and Irene Dick appeared as the only viable alternative to the situation we had to deal with. To that extent we all agreed on that course of action. Plaintiffs' counsel then impeached Birkholz with his deposition testimony.

beyond asking Valerie if she knew the name of her parents' physician.

This case presents the type of situation to which the court in *Hoffman v. Halden,* 268 F.2d 280, 297 (9th Cir.1959), was referring when it stated:

> We are not saying that there could not be situations where a judge was so deceived and hoodwinked by proceedings brought before him that certain of these preliminary acts might not raise themselves to the status of a proximate cause of an injury, notwithstanding the intervening order of the court. There might be situations where the action of the court became in substance, merely a conduit for the wrongful action which preceded.

(Footnote omitted). In light of the reckless manner in which Hunter and Ruppert in bad faith obtained the hold orders, the Court concludes that the orders were "merely a conduit" for the defendants' wrongful behavior.

■ Under these circumstances, the existence of court orders does not absolve Hunter and Ruppert from liability.[12] Public officials who act in bad faith cannot be allowed to escape liability on the theory that higher officials ratified their conduct. Sanctioning such a defense would be an invitation to anarchy. In this case, the jury properly concluded that the defendants proximately caused the violation of the Dicks' constitutional rights.

### 3. *Custom or policy.*

■ Watonwan County's and the Tri-County Board's next argument in support of their motions for judgment notwithstanding the verdict is that the acts and omissions of the individual defendants Schutt, Hunter, and Ruppert were not done pursuant to a governmental custom or policy, and that entry of judgment against the county and the Tri-County Board is therefore precluded by *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98· S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978).[13]

Two separate routes to municipal liability are present in this case. First, the conduct of Hunter and Ruppert in initiating commitment proceedings against the Dicks—conduct which the jury found proximately caused the violation of the Dicks' constitutional rights—creates municipal liability if Hunter and Ruppert acted in accordance with a custom or policy of the Tri-County Board. Second, Schutt's failure to properly train and supervise Hunter and Ruppert, if that failure implemented Tri-County Board custom or policy, also creates municipal liability.

The issue of municipal liability based on Hunter's and Ruppert's actions was not submitted to the jury because the Court ruled, as a matter of law, during the trial that Hunter's and Ruppert's conduct in seeking to initiate commitment proceedings against the Dicks based on unverified information from a minor child was in accordance with a policy of the Tri-County Board

12. This Court does not condone the issuance of the hold orders by the county court judge based on the meager amount of information contained in the commitment petitions. In this case, so far as can be gleaned from the record and time frames involved, the judge merely read the petition and issued an order to apprehend and confine the Dicks. It was clear from the petitions that petitioner Hunter was relying entirely on Valerie Dick, and Valerie's age was set forth in one of the petitions. There was no attempt by the judge, even in this small-town setting, to verify the need to seize the Dicks immediately without first giving them the benefit of a hearing. Certainly the judge could have required the county attorney to appear before him for further illumination on the need for an immediate commitment. Further, the judge could have summoned the welfare workers, or even the Dicks, to appear before him prior to signing the order. Our system of justice requires absolute immunity from suit for judges so that they may act in furtherance of their duties without fear or restraint. However, a judge surely has a duty to act as something other than an automaton in signing an order. The citizens of this state expect much more from their public officials.

13. Watonwan County makes the additional argument that its liability cannot be predicated on a custom or policy of the Tri-County Board. This argument was considered and rejected in part A of this memorandum and order. Watonwan County is jointly liable for any liability incurred by the Tri-County Board.

established by Schutt.[14] This ruling was fully supported by evidence in the record. In fact, Schutt's own testimony as to Tri-County Board policy compelled this ruling. Schutt, who was the supervisor of the Tri-County Human Services Department and who established the operating policies and procedures for the department testified as follows:

Q Was it within the policy of the Tri-County Human Services Department for someone such as Jerry Ruppert and Deb Hunter, to get out a petition for an involuntary confinement of someone like Alexander and Irene Dick on nothing more than the word of a 15-year-old child?

A It was within their authority to take the information to the county attorney, yes, information that they had.

Q And seek confinement of the 15-year-old child's parents?

A If that was appropriate, yes.

Q That was within the scope of procedures that you had established, was it not?

A Yes.

THE COURT: Were you the top official in this particular area that we are talking about here in the Tri-County group?

THE WITNESS: In that particular area, yes.

. . . .

Q Mr. Schutt, wasn't it left completely by yourself as a matter of policy, within the discretion of the individual worker, as to whether or not it was appropriate to consult with other adult kindred, such as, in this case, Homer and Irene Young—

A Yes.

Q —before getting out a petition for involuntary commitment of parents, such as Alexander and Irene Dick?

A Yes.

The defendants ask the Court to ignore Schutt's own admissions concerning Tri-County Board policies—policies established by Schutt himself. Relying on *Herrera v. Valentine,* 653 F.2d 1220, 1224 (8th Cir. 1981), and *Turpin v. Mailet,* 619 F.2d 196, 202 (2d Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980), the defendants contend that Watonwan County and the Tri-County Board can be held liable only if Schutt had notice of repeated prior misconduct by Hunter, Ruppert, or other employees of the Tri-County Human Services Board and failed to take remedial steps. They assert that a governmental policy or custom cannot be inferred from a single instance of official misconduct.

14. In posttrial communications with the Court, defense counsel have indicated that they misinterpreted or did not understand the Court's ruling. The Court's ruling was made on the record during an in-chambers conference on December 15, 1982.

THE COURT: I am going to rule as a matter of law as follows: . . .

Number one, I guess I have already ruled that the actions of the Tri-County Welfare Board are those of Watonwan County;

Number two, that Mr. Schutt was an official who, because of his position and responsibility in the area involved here, had the authority to establish policy for the Tri-County Board and, consequently, Watonwan County; and

Number three, I rule as a matter of law that Mr. Ruppert and Ms. Hunter acted within the policy established, in their actions in connection with the incident involved in this case.

Defense counsel did not object to these rulings (except for the continuing objection that the actions and policies of the Tri-County Board should not be attributed to Watonwan County) nor did they make any inquiry concerning the meaning of the Court's rulings.

The rulings formalized off-the-record comments made in chambers by the Court on December 13, 1982, with all counsel present. At that time, the Court expressed its intention to rule that Hunter's and Ruppert's actions were in accordance with a policy of the Tri-County Board established by Schutt. The Court then identified the policy at issue by reading a transcript of that portion of Schutt's testimony which is set out in the text of this opinion. Schutt's testimony clearly reveals that the Tri-County Board had a policy, established by Schutt, of permitting welfare workers such as Hunter and Ruppert to seek to initiate commitment proceedings against individuals based solely on the unverified statements of a minor child. Given this background, the Court's ruling of December 15 should not have been confusing to defense counsel. Even if defense counsel did not understand this ruling, there is no suggestion that their failure to comprehend the ruling in any way prejudiced them in the presentation of their case.

The defendants' argument, while accurately summarizing the holdings of *Herrera* and *Turpin* is irrelevant given the facts and circumstances of this case. *Herrera* and *Turpin* are applicable in cases in which direct evidence of governmental policy is lacking and it becomes necessary to infer an informal custom or policy based on the acts or omissions of high-ranking officials. *See Turpin,* 619 F.2d at 199. Here, in contrast, it was unnecessary to infer a custom or policy because Schutt described exactly what the policies of the Tri-County Board were. He also testified that he himself established those policies.

Under *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978), a government's policy or custom can be established either by "its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." As the supervisor of the Tri-County Human Services Department, Schutt had the authority to make policy for the department, and his acts and edicts are chargeable to the Tri-County Board and to Watonwan County.

The policy under which Hunter and Ruppert acted was also the moving force behind the constitutional violation. If the Tri-County Board's policy had required Hunter and Ruppert to undertake even a minimal investigation of Valerie's accusations, the inaccuracies in her statements would have been exposed and the Dicks almost certainly would not have been taken away to detoxification centers on temporary hold orders.

In summary, Schutt's admissions concerning the existence of Tri-County Board policy removed any jury question as to municipal liability based on the acts of Hunter and Ruppert.

■ The other route to municipal liability is through the conduct of Schutt himself. The jury found that Schutt had failed to properly supervise or train Hunter and Ruppert, that his failure was a proximate cause of the violation of the Dicks' constitutional rights, but that Schutt had acted in good faith. Given Schutt's qualified immunity, the jury's finding that he acted in good faith shields him from personal liability. *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982). However, the jury also determined that Schutt's failure to properly supervise or train Hunter and Ruppert was part of a policy or custom of the Tri-County Board. Since a governmental unit cannot take advantage of the good faith immunity of its employees, *Owen v. City of Independence,* 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980), this finding establishes a second and independent basis for liability of Watonwan County and the Tri-County Board.

■ The defendants contest the jury's findings concerning Schutt in several respects. First, they contend that there is insufficient evidence to support the jury's finding that Schutt failed to properly train or supervise Hunter and Ruppert. But Schutt's own testimony, some of which is quoted above, reveals that Schutt gave his subordinates virtually unbridled discretion to seek the confinement of suspected inebriates even in the absence of reliable evidence of inebriacy and dangerousness. This is the sort of reckless failure to train that properly gives rise to supervisory liability. *See Hays v. Jefferson County,* 668 F.2d 869, 874 (6th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982).

■ Next the defendants assert that the jury's findings concerning Schutt are inconsistent and must be vacated. In its answer to question 3.A. of the special verdict form, the jury found that Schutt had failed to properly supervise or train Hunter and Ruppert—a finding which the jury was instructed it could make only if it found that Schutt had deliberately or recklessly failed to train his subordinates. *See* Court's Instruction No. 18. In its answer to question 4.A. on qualified immunity, the jury found that Schutt had acted in good faith. Although the jury's answers at first blush appear inconsistent, it is the Court's duty to harmonize them if reasonably possible. *McIntyre v. Everest & Jennings, Inc.,* 575

F.2d 155, 157 (8th Cir.), *cert. denied,* 439 U.S. 864, 99 S.Ct. 187, 58 L.Ed.2d 173 (1978).

█ It appears that the jury properly applied the Court's instructions regarding supervisory liability. As noted above, the jury's implicit finding that Schutt acted recklessly in failing to properly supervise or train his subordinates was supported by the record. It also appears that, in considering the issue of Schutt's qualified immunity, the jury applied a common sense understanding of the concept of "good faith" and found that Schutt, who did not participate in the confinement of the Dicks and who, in fact, had no contact with the Dicks prior to their confinement, did not act in bad faith vis-a-vis the Dicks. The Court does not find the jury's answers to be "irreconcilably inconsistent." *McIntyre,* 575 F.2d at 157. It is entirely possible for an individual to be reckless in establishing procedures which are likely to produce violations of constitutional rights while at the same time exhibiting no bad faith toward the ultimate victims of those unconstitutional procedures.

█ Finally, the defendants argue that Schutt's failure to supervise or train Hunter and Ruppert does not implicate a governmental custom or policy absent some notice to Schutt of prior misconduct by Hunter, Ruppert, or their fellow employees. However, in a case involving alleged failure to train the members of a police force, the United States Court of Appeals for the Sixth Circuit recently held:

> Where, as here, the constitutional violation was not alleged to be part of a pattern of past misconduct, a supervisory official or a municipality may be held liable only where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result.

*Hays v. Jefferson County,* 668 F.2d 869, 874 (6th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982) (citations omitted). The policies and procedures established by Schutt, which allowed employees such as Hunter and Ruppert to seek to initiate commitment proceedings against individuals based on unverified statements of a minor child, is the type of reckless failure to train and supervise which is "substantially certain" to result, sooner or later, in the erroneous confinement of an individual in violation of that individual's constitutional rights. Consequently, Watonwan County and the Tri-County Board are also liable under this second theory of municipal liability.

### 4. *Qualified immunity.*

The individual defendants contend that the Court erred in not granting their motion for a directed verdict based on their defense of qualified immunity. This argument is without merit.

█ Qualified immunity is an affirmative defense which must be pleaded and proved. *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982). In order to establish the defense, a defendant must prove that his or her conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 102 S.Ct. at 2738.

█ Hunter and Ruppert failed to meet their burden, and the jury properly found that they did not act in good faith. The Dicks' right not to be deprived of their liberty without due process of law was clearly established and a right of which any reasonable person would have known. Any reasonable person in Hunter and Ruppert's position would also have known of his or her duty to comply with the requirements of the judicial commitment law, as modified by *State ex rel. Doe v. Madonna,* 295 N.W.2d 356 (Minn.1980). Yet the defendants abused the law by failing to investigate Valerie's accusations, failing to obtain physician's statements, and failing to consider alternatives to confinement.

Every parent with a teenage child will recognize that hyperbole is often used by the child in discussing the parent, and by the parent in discussing the child. Yet

Hunter and Ruppert, professional social workers who by their own admission knew that Valerie had a motive to exaggerate, accepted the statements of a 15-year-old child as true and made no attempt to contact adult members of the Dick family or other professionals such as the Dicks' physician or Renee Snyder, their own co-worker, any of whom could have easily refuted Valerie's wild accusations. Ruppert's callous disregard for the Dicks' rights was revealed in his testimony that he saw no harm in confining the Dicks because "[t]heir story would be brought out at the hearing" three days later. Ruppert also testified in a portion of his deposition read to the jury that, since the Dicks had refused his offer of alcohol counseling after the October 31 domestic dispute—a refusal he interpreted as a symptom of alcoholism—he and Hunter decided "the only way that we would be able to get [the Dicks] through treatment was through commitment." Deposition of Jerry Ruppert, Apr. 7, 1982, at 51. In short, the defendants' own testimony reveals that they decided to get the Dicks into alcohol treatment at any cost, including sacrificing the Dicks' constitutional rights. For these reasons, the denial of the defendants' motion for a directed verdict on the issue of qualified immunity was proper.

### 5. Punitive damages.

██ The Eighth Circuit has held that " '[p]unitive damages may . . . be awarded in civil rights actions where the defendant exhibits oppression, malice, gross negligence, willful or wanton misconduct, or a reckless disregard for the civil rights of the plaintiff.' " Pellowski v. Burke, 686 F.2d 631, 634–35 (8th Cir.1982), quoting Guzman v. Western State Bank of Devils Lake, 540 F.2d 948, 953 (8th Cir.1976). Hunter's and Ruppert's conduct unquestionably meets this standard and the jury properly found them liable for punitive damages.

The jury's assessment of punitive damages against Schutt, however, is inconsistent with its finding that Schutt acted in good faith. In order to reconcile the verdict, the Court will vacate that portion of the verdict which imposes liability on Schutt for punitive damages.

### C. New Trial

In ruling on the defendants' motions for a new trial, the Court must apply the following standards:

> It is settled law in this circuit that the district court, in considering a motion for a new trial, must set aside a jury verdict where it has determined that the verdict is against the clear weight of the evidence, Fireman's Fund Ins. Co. v. Aalco Wrecking Co., 466 F.2d 179, 186 (8th Cir. 1972), cert. denied, 410 U.S. 930 [93 S.Ct. 1371, 35 L.Ed.2d 592] (1973), that it is the result of passion or prejudice, id.; Mueller v. Hubbard Milling Co., 573 F.2d 1029, 1039–40 (8th Cir.), cert. denied, 439 U.S. 865 [99 S.Ct. 189, 58 L.Ed.2d 174] (1978), or that the verdict is clearly excessive. Slatton v. Martin K. Eby Constr. Co., Inc., 506 F.2d 505, 508 (8th Cir.1974), cert. denied, 421 U.S. 931 [95 S.Ct. 1657, 44 L.Ed.2d 88] (1975). Furthermore, the district court, in passing on such motions, is not required to view the evidence in the light most favorable to the non-movant; rather, "[i]t may weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." Slatton v. Martin K. Eby Constr. Co., Inc., 506 F.2d at 508 n. 4.

Ouachita National Bank v. Tosco Corp., 686 F.2d 1291, 1294–95 (8th Cir.1982).

The defendants' motions for a new trial raise numerous grounds, many of which have already been discussed and will not be repeated. The remaining grounds relate to various evidentiary issues and to the amount of the verdict.

### 1. Evidentiary issues.

██ The defendants first contend that there is insufficient evidence to support the jury's verdict as to liability. No extended discussion of this point is needed in light of the Court's lengthy discussion of the evidence above. The jury's findings of liability are fully supported by the evidence.

The separate issue of damages is considered below.

The defendants next assert that the Court erred in admitting plaintiffs' exhibit 4, a newspaper article from the local St. James newspaper describing various community efforts to combat chemical dependency. The article quotes defendant Schutt as saying that community action "has the best chance of impacting the drug problem in the community." The defendants contend that the article should have been excluded as hearsay.

A claimed evidentiary error is grounds for a new trial only if the error is "prejudicial" and "goes to the very heart of the case." *Midcontinent Broadcasting Co. v. North Central Airlines, Inc.,* 471 F.2d 357, 359 (8th Cir.1973). The admission of plaintiffs' exhibit 4 does not meet this standard. The defendants contend that the article unfairly suggests that Watonwan County had a policy of confining suspected inebriates. However, the article contains no mention or suggestion of confinement as a method of dealing with alcohol abuse, but instead focuses on the need to heighten community awareness of the problem. The defendants also complain that the article contains the opinions of the author without the opportunity for cross-examination. But the article is strictly a factual account, not an editorial. Schutt agreed at trial that the article quoted him correctly. Thus, the Court finds no prejudicial error in the admission of plaintiffs' exhibit 4.

The defendants also assert that it was error for the Court to permit the plaintiffs to impeach the credibility of two defense witnesses, Leland Olson and Caryl Olson, through rebuttal witnesses. The Olsons, former neighbors and social companions of the Dicks, were called by the defendants to rebut the Dicks' testimony that they (the Dicks) were not alcoholics. The Olsons' testimony was received only for the purpose of impeaching the Dicks' credibility, not for the purpose of showing that the Dicks were, in fact, alcoholics since that issue was irrelevant to whether or not the defendants had sufficient grounds for initiating commitment proceedings against the Dicks.[15]

After the Olsons testified to various alleged episodes of excessive drinking on the part of the Dicks, plaintiffs' counsel sought to present rebuttal witnesses to impeach the Olsons' credibility and to show the Olsons' bias against the Dicks. The Court granted counsel's request since denying the plaintiffs the same opportunity for impeachment which the defendants had been afforded would have created a double standard in favor of the defendants. The defendants now contend that allowing the plaintiffs' rebuttal witnesses to testify about the Olsons' behavior violated Federal Rule of Evidence 608(b).[16]

While Rule 608(b) bars the use of extrinsic evidence to prove specific instances of conduct bearing on character for truthfulness or untruthfulness, it does not bar the use of extrinsic evidence for other purposes such as impeachment by contradiction and proof of bias. *United States v. Opager,* 589 F.2d 799, 802 (5th Cir.1979) (impeachment by contradiction); *United States v. Brown,* 547 F.2d 438, 445–46 (8th Cir.), *cert. denied,* 430 U.S. 937, 97 S.Ct. 1566, 51 L.Ed.2d 784 (1977) (proof of bias or prejudice). The trial court exercises broad discretion in determining the extent to which inquiry may be made into collateral matters. *United States v. Brown,* 547 F.2d at 446.

---

**15.** It is undisputed that, at the time the decision to seek the Dicks' confinement was made, the individual defendants had no knowledge of any of the alleged incidents about which the Olsons testified.

**16.** Rule 608(b) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

■ In this case, it was proper for the Court to allow the plaintiffs' rebuttal witnesses to testify about the Olsons' excessive drinking since during cross-examination the Olsons had denied being alcoholics. The Olsons' drinking behavior was a material issue given that excessive drinking might impair their ability to observe and recollect events about which they had testified at trial. The defendants also object to testimony relating to the Olsons' domestic disputes. Again, this testimony was proper impeachment by contradiction. Finally, testimony concerning instances in which the Olsons had to be restrained from bothering the Dicks at the VFW Club was properly received as evidence of bias by the Olsons against the Dicks.

■ The defendants also complain about the treatment of their witness James Neid, a bar owner in St. James. Like the Olsons, Neid testified about alleged excessive drinking by the Dicks. In rebuttal, the plaintiffs recalled Valerie Dick who testified about sexual advances Neid had made toward her and which she had rebuffed. Valerie's testimony was clearly admissible as it went to Neid's possible bias against the Dicks.

■ The remaining evidentiary issue concerns the Court's questioning of defendant Hunter during her testimony on behalf of the defendant. The Court asked three or four questions concerning the dependency petition for Valerie which Hunter signed. The defendants contend that the Court's questions intimated disapproval of Hunter's actions and affected the jury's verdict. A federal judge has discretion to make appropriate inquiry of witnesses. There was no error in these inquiries, and, further, the Court sees no prejudice since the propriety or impropriety of the dependency petition was not an issue in the case and since the jury was instructed that "[n]othing said by [the Court] during the trial itself, is meant to suggest or convey in any way or manner any indication as to what verdict [the Court] think[s] you should find." Court's Instruction No. 39.

The defendants raise several other evidentiary points, none of which merits discussion and none of which warrants granting a new trial.

### 2. *Amount of the verdict.*

The defendants have also moved for a new trial on the ground that the verdict is excessive and was the result of passion and prejudice. In the alternative, the defendants request a remittitur.

■ A trial court has authority to cure an excessive verdict either by granting a new trial or by denying a new trial conditional upon the plaintiff's filing a remittitur of the excessive portion of the damages. 11 C. Wright & A. Miller, Federal Practice and Procedure § 2815 at 99–100 (1973). A new trial is mandatory when the excessive verdict results from passion and prejudice on the part of the jury because of the possibility that these influences affected the jury's findings on liability as well as on damages. *Id.* at 103. Thus, the first question is whether the entire trial was so permeated with passion and prejudice that a new trial is required.

■ The defendants contend that the size of the verdict—$1 million in compensatory damages and $12,000 in punitive damages—automatically gives rise to an inference that the jury was motivated by passion and prejudice. However, passion and prejudice should not be inferred merely from the size of the verdict in a case such as this where the damages are largely intangible and extremely difficult to measure with any precision. *See Taken Alive v. Litzau,* 551 F.2d 196, 198 (8th Cir.1977). The jury was instructed that it could award damages for the present and future physical, emotional, and mental harm the plaintiffs suffered, for the plaintiffs' loss of reputation, and for the violation of the plaintiffs' substantive constitutional rights to liberty and to due process of law. Court's Instruction No. 26.[17] Clearly, the jury was required to award damages for the violation of the plain-

---

17. The defendants contend that it was error for the Court to instruct the jury that it could

award damages for the violation of the plain-

make exceedingly abstract and subjective valuations in arriving at its verdict. Given the difficulty of the jury's task, its verdict of $1 million, which is the amount plaintiffs' counsel requested in his closing argument, is not so excessive as to give rise to an inference that the jury was motivated by passion and prejudice.

The defendants also contend that plaintiffs' counsel tainted the jury's verdict through improper closing argument. None of the three defense counsel objected at any time to counsel's argument, however. Despite the absence of a timely objection, the Court has reviewed the transcript of counsel's closing argument and finds that, while some of counsel's comments would have been better left unsaid, counsel's summation, taken as a whole, did not constitute improper argument.

Although there is no indication the jury's verdict was the result of passion and prejudice, nevertheless the Court finds that the verdict is excessive and must be reduced in order to avoid an unconscionable result. See Ouachita National Bank v. Tosco Corp., 686 F.2d 1291, 1295 (8th Cir.1982). The difficult question is the amount of the remittitur. It is neither possible nor necessary that the remittitur "be capable of precise calculation." United States v. 47.14 Acres of Land, 674 F.2d 722, 728 (8th Cir. 1982). However, in order to preserve the plaintiff's constitutional right to a jury trial, an excessive verdict should be reduced to no less than the highest amount which the jury properly could have awarded. Slatton v. Martin K. Eby Constr. Co., 506 F.2d 505, 508–09 (8th Cir.1974), cert. denied, 421 U.S. 931, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975).

There is substantial evidence in this case of serious harm to the plaintiffs. Without prior notice or a hearing, the Dicks were taken from their home by a squad of uniformed police officers, driven in marked police cars to separate detoxification centers miles from their home, and confined without cause for three days. Alexander Dick was forced to endure wretched living conditions at the center to which he was confined while Irene Dick, confined in a relatively comfortable center, was subjected to defendant Ruppert's threats to have her transferred to a less desirable institution unless she would agree to voluntarily commit herself for treatment. The plaintiffs' testimony concerning the humiliation and mental anguish they suffered both during and after their confinement was corroborated by the testimony of other family members. Alexander Dick's own emotional testimony poignantly revealed his continuing emotional distress. In addition to these physical and emotional injuries, the plaintiffs are also entitled to compensation for the violation of their substantive constitutional rights. Damages for this type of injury are not easily quantified. In determining a just award it is appropriate to consider that the right at issue—the right not to be deprived of liberty without due process of law—is among the most fundamental of all civil rights.

After careful consideration, the Court has determined that $125,000 to each of the plaintiffs is the maximum amount of damages the jury properly could have awarded. The power to order a remittitur as an alternative to a new trial is peculiarly within the discretion of the trial judge. Brown v. Scaggs-Albertson's Properties, Inc., 563 F.2d 983, 988 (10th Cir.1977). Remittitur is preferable to a new trial where, as here, liability is clear and a new trial would be lengthy and costly. See United States v. 47.14 Acres of Land, 674 F.2d 722, 728 (8th Cir.1982). The action of a trial court in curing an excessive verdict is "not in derogation of the right to trial by jury, 'but is one of the historic safeguards of that right.'" Slatton v. Martin K. Eby Constr. Co., 506 F.2d 505, 508 (8th Cir.1974) (quoting Aetna Cas. & Sur. Co. v. Yeatts, 122 F.2d 350, 353 (4th Cir.1941)), cert. denied, 421 U.S. 931, 95 S.Ct. 1657, 44 L.Ed.2d 88

tiffs' substantive constitutional rights. The defendants failed to raise this objection at trial. In any event, the instruction was clearly proper in light of Herrera v. Valentine, 653 F.2d 1220,

1226–31 (8th Cir.1981). See also Note, Damage Awards for Constitutional Torts: A Reconsideration After Carey v. Piphus, 93 Harv.L. Rev. 966 (1980).

(1975). Accordingly, unless *each* of the plaintiffs files a remittitur in the amount of $375,000 within 30 days of the date of this order, the Court will order a new trial.

### D. *Attorneys' Fees and Costs*

The plaintiffs seek an award of attorneys' fees pursuant to 42 U.S.C. § 1988 and an award of costs. The defendants object to the amount of both requested awards.

 Initially, the defendants contend that the Court should exercise its discretion to deny attorneys' fees altogether. The Court declines to do so. The plaintiffs are beyond dispute "prevailing parties" and there are no special circumstances which would make an award of fees unjust.

 The first step in determining an appropriate attorneys' fee award is to calculate the lodestar or base fee for the attorneys' services. The plaintiffs' claimed lodestar fee consists of $37,756.25 for attorney Jerome Rice (302.05 hours at $125 per hour), and $17,430.00 for attorney Gregory Spalj (232.4 hours at $75 per hour), for a total of $55,186.25. The defendants take issue both with the hourly rates and with the number of hours claimed.

 A court is not bound by what the lawyer claims to be his or her hourly rate. Attorneys' fees must be reasonable. *Avalon Cinema Corp. v. Thompson,* 689 F.2d 137, 140 (8th Cir.1982). The Court finds that $125 per hour is a reasonable rate for an attorney of Rice's experience and ability. Supporting affidavits indicate that $125 per hour is a rate which is not uncommon among senior attorneys in this district. Lodestar rates of $125 per hour have been upheld in two recent Eighth Circuit cases. *Alexander v. National Farmers Organization,* 696 F.2d 1210 (8th Cir.1982); *Paschall v. Kansas City Star Co.,* 695 F.2d 322, 337 (8th Cir.1982). The rate claimed for Spalj, $75 per hour, may be somewhat excessive given Spalj's second-chair role at trial and the fact that he had engaged in the practice of law for only a few months at the time of trial. The supporting affidavits suggest that a rate in the area of $60 per hour would be more typical under the circumstances. However, the Court does not find Spalj's rate to be unreasonably high.

 The defendants seek reductions in the number of hours claimed for time devoted to unsuccessful claims, time spent at a second settlement conference, and time spent on several miscellaneous items including briefing news reporters. A trial court has discretion to award fees for time spent on unsuccessful as well as successful claims, so long as the unsuccessful claims were not "clearly frivolous or manufactured" but were "reasonably calculated to advance [the] client's interests." *Brown v. Bathke,* 588 F.2d 634, 637 (8th Cir.1978). Although the plaintiffs ultimately prevailed only on their section 1983 claim, their common law claims for false arrest, false imprisonment, and malicious prosecution were not frivolous or manufactured. Moreover, since the factual basis of the common law claims was identical to that of the section 1983 claim, little additional time was spent pursuing the common law claims. The plaintiffs' claims against those parties who were either dismissed by the Court on immunity grounds, or voluntarily dismissed by the plaintiffs, were also not frivolous or manufactured. The three hours devoted to a second settlement conference must be deducted since the second conference was necessitated by Rice's failure to bring his clients to the first conference. Rice's time spent briefing reporters is compensable. The need to brief reporters resulted from the substantial publicity generated by the nature of the case rather than from any initiation of media contact by Rice. The other requested reductions are denied. Accordingly, the Court reduces the lodestar fee by $375 (3 hours at $125 per hour) to $54,811.25.

 The next step involves determining whether the lodestar fee should be increased to compensate for exceptional quality of representation or unusual risk of the litigation. The plaintiffs bear a heavy burden in establishing that they are entitled to an increase for quality or risk. *Paschall v. Kansas City Star Co.,* 695 F.2d 322, 337 (8th

Cir.1982). The Court finds that no such increase is warranted here.

■ The trial of this case was not unusually difficult or complex. The case proceeded to trial in less than ten months. Although plaintiffs' counsel performed well, the quality of counsel's work is already reflected in their hourly rates. In particular, the rate allowed for attorney Spalj provides an enhancement of the lodestar fee. As for risk, it is true that Rice, a sole practitioner at the time this case was filed, was opposed at trial by three attorneys from much larger firms, and that he may have had to forego other employment possibilities in order to prepare the case. However, the amount of the hourly fee awarded in this order also incorporates this sort of risk. Parenthetically, moreover, the risk of the litigation is offset by the desirability of the case in terms of its effect on counsel's reputation. The substantial publicity attending the case will no doubt be beneficial to counsel's practice. The Court must also take into consideration counsel's contingent fee arrangement with the plaintiffs. The court-awarded attorneys' fees will be added to the judgment and counsel's contingent fee percentage will be applied to the total amount. This fee arrangement will adequately compensate counsel for their services. For these reasons, the Court declines to increase the lodestar fee.

The plaintiffs have also moved for an award of $4,772.50 for time spent on their attorneys' fees application. The defendants do not contest this amount. Accordingly, the Court will award attorneys' fees in the lodestar amount of $54,811.25 plus $4,772.50 for the attorneys' fees application for a total award of $59,583.75.

■ Finally, the plaintiffs seek an award of costs in the amount of $5,451.71. This figure includes the following costs which are not allowable:

1. transcript of Rice's closing argument prepared at Rice's request ($150.00);

2. lodging and meals for the plaintiffs and Irene Young during trial ($684.23);

3. Lexis computer-assisted research ($188.75). *Leftwich v. Harris-Stowe State College,* 702 F.2d 686 at 695 (8th Cir.1983). The total of allowable costs is, therefore, $4,428.73.

IT IS ORDERED that:

1. the motions of all the defendants to amend the judgment are denied;

2. Watonwan County's motion for entry of judgment notwithstanding the verdict is denied;

3. the motion of the Tri-County Human Services Board, William Schutt, Deborah Hunter, and Jerry Ruppert for entry of judgment notwithstanding the verdict is granted in part and denied in part as follows:

a. the motion is granted as to defendant William Schutt's liability for punitive damages. The Clerk shall enter judgment in favor of Schutt on the plaintiffs' claim against him for punitive damages;

b. the motion is in all other respects denied;

4. the motions of all the defendants for a new trial are granted unless *each* of the plaintiffs, within 30 days of the date of this order, files with the Clerk of Court a remittitur in the amount of $375,000;

5. the plaintiffs' motion for an award of attorneys' fees is granted in the amount of $59,583.75, with an additional award of costs in the amount of $4,428.73.

LET JUDGMENT BE ENTERED ACCORDINGLY.