Jordan Mark SUTKIEWICZ, by his
Conservator, Dennis SUTKIEWICZ,
Plaintiff,

v.

Detective Sergeant Walter CARLSON, Detective Captain Otra Lynch, and Detective William Maurice, Defendants.

No. 92–CV–74412–DT.

United States District Court,
E.D. Michigan, S.D.

April 25, 1994.

Justin Ravitz, Southfield, MI, for plaintiff.

Mark Verwys, Grand Rapids, MI, for defendants.

OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT/MOTION *IN LIMINE* REGARDING PROXIMATE CAUSE TO LIMIT EVIDENCE, TESTIMONY AND/OR ARGUMENT CONCERNING DAMAGES

ROSEN, District Judge.

## I. *INTRODUCTION*

This lawsuit arises out of the investigation and arrest of Plaintiff Jordan Mark Sutkiewicz for the July 1981 murder of Gloria Krouse in Monroe County, Michigan, and Sutkiewicz's subsequent October 1981 placement and ensuing 10–year commitment and treatment in the Michigan Center for Forensic Psychiatry.

On December 23, 1993, the Court entered an Opinion and Order regarding Defendants' Motions for Summary Judgment. In that Opinion and Order, the Court held that, although the Defendant officers had sufficient evidence to constitute probable cause at the time of Sutkiewicz's arrest for Gloria Krouse's murder on July 24, 1981, they had a continuing duty to turn over to the prosecutor any exculpatory information they obtained after Sutkiewicz's arrest. Because the Court found that material issues of fact exist as to what the Defendant officers learned after July 24, 1981 regarding a second murder suspect, Thomas Gilbert, and what post-arrest information, if any, was conveyed to the prosecutor, the Court ordered that the case proceed to trial.[1] Trial is scheduled to commence on April 25, 1993.

---

1. In addition to ruling on Plaintiff's probable cause "continuing duty" theory, in its December 1993 Opinion and Order, the Court (1) dismissed all of Plaintiff's federal and state law claims against the Monroe County Sheriff's Department and Sheriff Charles Harrington, and (2) dismissed Plaintiff's § 1983 claim for Fifth Amendment violation and his state law gross negligence and abuse of process claims.

With respect to Plaintiff's claims against the remaining three Defendants—Detective Sergeant Walter Carlson, Detective Captain Otral Lynch and Detective William Maurice—the Court found

This matter is now before the Court on Defendants' March 17, 1993 "Motion *in Limine* to Exclude or Limit Evidence, Testimony and/or Argument Concerning Damages. This motion was supplemented, pursuant to the Court's instruction, by Defendants' March 28, 1993 "Motion for Partial Summary Judgment/Motion *in Limine* Regarding Proximate Cause."[2] Plaintiff has filed Briefs responding to Plaintiff's Motion and supplemental Motion.

Having reviewed and considered the parties' respective Briefs and supporting documents, and having further reviewed the record of the probate proceedings concerning Mr. Sutkiewicz's commitment at the Center for Forensic Psychiatry previously submitted to the Court by Defendants,[3] the Court is now prepared to rule on the instant Motion.

## II. *PERTINENT FACTUAL BACKGROUND*

### THE GLORIA KROUSE MURDER INVESTIGATION AND ARREST OF JORDAN MARK SUTKIEWICZ

On July 10, 1981, Gloria Krouse was reported missing by her husband several hours after she left home to go grocery shopping at the Kroger's store in the Merchant's Landing Shopping Plaza in Washington Township, Michigan. A few hours later, the car that Mrs. Krouse had been driving was found behind the shopping plaza.

The body of Gloria Krouse was found the next day, July 11, in a wooded area in nearby Erie Township, Michigan. She had been stabbed numerous times in her back, abdomen, breasts and eyes, and her throat had been slashed.

The Monroe County Sheriff's Department thereafter began a homicide investigation under the direction of Detective Captain Otra Lynch. Lynch assigned Detective Sergeant Walter Carlson to head the investigation and assigned Detective William Maurice to assist Carlson. Four police agencies from Michigan and Ohio participated in the investigation. Numerous witnesses from the Merchant's Landing Shopping Plaza were interviewed by the police agencies, and a composite description of a suspect was eventually put together.

On July 21, 1981, Officer McMahn of the Washington Township, Police Department found Jordan Mark Sutkiewicz in the field adjacent to the Merchant's Landing Shopping Plaza where Mrs. Krouse's car had been found. Officer McMahn believed that Sutkiewicz fit the description given by witnesses as the person seen in Gloria Krouse's car on July 11. Therefore, Officer McMahn transported Sutkiewicz to the Monroe County Sheriff's Department where Detective Sergeant Carlson and Detective Maurice interviewed him. Sutkiewicz told the officers that he was from Wisconsin and that he had been arrested several times for shoplifting, bike theft, breaking and entering, glue sniffing, and escaping from an institution.

After Sutkiewicz was advised of his rights, a line-up (which included Sutkiewicz) was conducted in Monroe City/County Law Enforcement Building. Two of the witnesses that viewed the lineup identified Sutkiewicz as the person they thought they saw at Mrs. Krouse's car. Another witness, Montana McClanahan, who could not positively ID Sutkiewicz immediately after the line-up, called Sergeant Carlson after he got home from the lineup and said that he also thought Sutkiewicz was the person he had seen on July 11.

Because Sutkiewicz was homeless and the Sheriff's Department did not want to lose track of his whereabouts, Carlson and Mau-

---

that, pursuant to its "continuing duty" ruling in connection with the probable cause issue, material issues of fact precluded entry of summary judgment on Plaintiff's § 1983 false arrest claim and state law claims of malicious prosecution and false imprisonment, and also precluded a summary judgment ruling in favor of these three Defendants on the qualified immunity and *Ross* immunity questions.

**2.** Although filed as two separate motions, the pleadings actually make up one single motion, and therefore, are treated as such in this Opinion and Order.

**3.** The probate records were submitted to the Court on June 28, 1993 as Volume III of the Monroe County Sheriff's Department Defendants' Exhibits in support of their Motion for Summary Judgment.

rice arranged for Sutkiewicz to stay at the Calvary Baptist Mission which was managed by Reverend Charles Younts.

The detectives later contacted Sutkiewicz's sister-in-law and his mother. His mother indicated that Jordan used to live with his brother and sister-in-law in Kenosha, Wisconsin but had left more than three years earlier. His sister-in-law also indicated that Jordan had been in some trouble with the police in Wisconsin and Maryland, and that he had resided in a mental hospital in Maryland for a while. She also indicated that she believed Jordan had been abusing drugs.

During his stay at the Calvary Baptist Mission, Reverend Younts recorded conversations with Sutkiewicz on two cassette tapes. In these conversations, Reverend Younts discussed the Krouse murder in detail with Sutkiewicz. Reverend Younts subsequently called the Sheriff's Department and reported what Sutkiewicz had told him. After hearing Younts' account of what Sutkiewicz had told him during his stay at the mission, on July 23, 1981, Sergeant Carlson picked Sutkiewicz up from the mission and transported him to the Sheriff's office to be interviewed. After being read his rights, Sutkiewicz gave statements to three different detectives, and confessed to killing Gloria Krouse.

Following Sutkiewicz's confession, Detective Carlson prepared a recommendation for an arrest warrant. Captain Otra Lynch hand-delivered the recommendation and all of the police reports regarding the investigation as of that date to then Monroe County Prosecutor Michael LaBeau and his chief assistant, (now Judge) William LaVoy.

On July 24, 1981, a warrant was authorized by Chief Assistant Prosecutor LaVoy, and a complaint for first degree murder against Sutkiewicz was filed.

Sutkiewicz was subsequently arraigned, and on July 27, 1981, he was appointed an attorney. On July 31, 1981, Sutkiewicz's court-appointed attorney, Thomas Nordstrom, filed a Motion for Diagnostic Commitment to determine whether Sutkiewicz was mentally competent to stand trial. The prosecutor attorney, Michael LaBeau, concurred in Nordstrom's motion, and Monroe County District Judge Taft, accordingly, entered a diagnostic commitment order.

On September 29, 1981, pursuant to M.C.L. § 330.2026, Sutkiewicz was taken to the Michigan Center for Forensic Psychiatry in Ypsilanti for an evaluation of his mental competency. On October 12, 1981, Norman C. Poythress, PhD, a certified examiner for the CFP sent a report to Judge Taft recommending that Sutkiewicz be treated at the Center because he found Sutkiewicz to be incompetent to stand trial.

On October 16, 1981, pursuant to M.C.L. § 330.2032, Judge Taft entered an Order finding Sutkiewicz incompetent to stand trail and ordering that he receive treatment as an inpatient at the CFP to regain his competency.

## SUTKIEWICZ'S PRIOR CRIMINAL AND MENTAL HEALTH HISTORY

Upon Sutkiewicz's admission to the Center for Forensic Psychiatry, the hospital obtained extensive records from agencies and institutions that had contact with Mr. Sutkiewicz prior to July 1981. Those records revealed that Sutkiewicz began to exhibit behavioral problems as a child, was found to be a slow learner, and had come into contact with juvenile authorities at an early age. He had been placed in a residential facility for youth as early as 1970 from which he escaped, and in 1973, he escaped from a boys' forestry camp.

In 1975, he was arrested for attacking two people with a chain during a fight. In 1977, while residing in Kenosha, Wisconsin, he was arrested for several minor property offenses. After one adjudication on a charge of malicious destruction of property, he was placed in a halfway house but eloped from that facility.

A short while later, he moved to Maryland and was soon charged with breaking and entering, and malicious destruction of property. He was placed in a local jail and in an attempted escape from that jail, he broke the arm of a jail guard and was charged with assault. He was found incompetent to stand trial and was admitted to the Springfield

Psychiatric Hospital Center, for treatment to regain competency. He eloped several times from the Springfield facility. During these elopements, Sutkiewicz accumulated charges of shoplifting, glue sniffing and car theft. These problems precipitated his transfer to the Clifton T. Perkins Hospital, a maximum security/forensic facility in Maryland, in April 1977. He remained at the Perkins Hospital facility until April 1981 and was never restored to competency.

## THE CONTINUED INVESTIGATION REGARDING THE KROUSE MURDER

Although Sutkiewicz had been charged with the murder of Gloria Krouse in July 1981, the Monroe County Sheriff's Department continued investigating the crime. On August 18, 1981—less than three weeks after Sutkiewicz was arrested—the Sheriff's Department received information regarding an additional suspect, Thomas Gilbert of Toledo, Ohio. Gilbert was a white male, 5'8"–5'9" tall, weighing 200–210 pounds with sandy brown/blond hair.

Within a month of the murder of Gloria Krouse, Thomas Gilbert committed at least two multiple-stabbing/throat slashing murders in Northern Ohio on August 12 and August 14, 1981. On August 12, 1981, Gilbert abducted 19–year–old Sandy Jo Hogue from a convenience store in Akron, Ohio, stabbed her 26 times, slashed her throat and left her body in a field behind a shopping center. After he was convicted for Sandy Jo Hogue's murder, Gilbert confessed to (but was not prosecuted for) the murder of Andrea Schafer on August 14, 1981. Gilbert had abducted Ms. Schafer from the street, stabbed 13 times, slashed her throat and left her body in a field behind a school.[4]

4. Gilbert was also suspected of the murder of a 60–year–old neighbor of his when he was a minor. The woman who was murdered had been stabbed 60 times and sexually assaulted. Although Gilbert had been charged with this crime, he was ultimately found not guilty by a juvenile judge.

5. Also, on July 17, 1981, a young woman was forced off the road in Michigan near the Ohio border by someone in a green station wagon (as discussed *infra,* Gilbert was known to have

In addition, prior to the two murders in Akron, on July 28, 1981—a little over two weeks after Gloria Krouse was murdered—Gilbert kidnapped at knife point, robbed and sexually assaulted Marie C. Beaudry. This crime occurred in Erie Township, Michigan—the township in which Gloria Krouse's body was found.[5]

Monroe County Sheriff's Captain Otra Lynch received initial information regarding the arrest of Thomas Gilbert for the murder of Sandy Jo Hogue via a L.E.I.N. message from the Akron, Ohio Police Department on August 17, 1981 and a follow-up contact with the Michigan State Police. From the State Police, Captain Lynch learned of Gilbert's suspected involvement with the abduction and rape of Marie Beaudry in Erie Township. The State Police informed Captain Lynch that they had learned that Gilbert had been working at Fisher's Marina in Erie Township and that his presence in the area coincided with the timing of the murder of Gloria Krouse.

On Friday, August 21, 1981, Captain Lynch assigned Detectives Carlson and Maurice to go to Akron to talk to the police there. With the Akron Police, Detectives Carlson and Maurice interviewed the local county coroner and viewed slides of the wounds involved in the Hogue and Shaefer cases and of the wounds involved in the murder of Gilbert's elderly neighbor eight years earlier. They also went to the office of the Ohio Bureau of Criminal ID and Investigation where they viewed Gilbert's car and evidence found in it. Among this evidence was a Michigan one-day fishing license dated July 11, 1981—one day after the date on which Gloria Krouse was murdered. The license had been sold by Fisher's Marina in Erie Township, Michigan.

owned a green station wagon) and the person described fits the Thomas Gilbert. A similar scenario occurred in Akron—a young woman was forced off the road by an individual in a different type of car and when Thomas Gilbert's picture appeared in the paper as the person having been charged with committing the Hogue murder, the woman called the authorities to inform them that the man pictured, i.e., Gilbert, was the man who forced her off the road.

On August 24, 1981, Detective Carlson went to Fisher's Marina and interviewed the owner, John Fisher, who knew Gilbert because he had been "hanging around" the marina for the several months. (Gilbert and Fisher's late stepson, Alvin Davis, served time together in the Mansfield, Ohio reformatory.) Mr. Fisher told Carlson that Gilbert had been driving a green 1973 Ford LTD station wagon that had wood-grain side panels. Fisher told Carlson that Gilbert had wrecked the front end of the car on July 11th—the date for which he had obtained a one fishing license. Fisher further told Carlson that on that day, Gilbert's hand was bandaged and that Gilbert told him he had cut it in a fight he was involved in the previous evening.

Carlson followed up on the information regarding Gilbert that tied him to Toledo, Ohio. During the Toledo follow-up, Carlson learned that, although the station wagon still was running, Gilbert sold the car as "junk" for $60.00. It was during his August 26, 1981 Toledo investigation that Carlson learned that Steve Davis, the brother of Gilbert's deceased friend, Alvin Davis, also had purchased a Michigan one-day fishing license for July 11, 1981.

On September 1, 1981, Carlson advised the Akron Police Department that he was making arrangements to come to Akron to interview Gilbert. He told Akron Police Sergeants Blaydes and Hoffman that he considered Gilbert to be a "prime suspect" in the Gloria Krouse murder. Gilbert by this time was charged for the murder and sexual assault of Sandy Jo Hogue and was in custody in Akron.

Carlson arrived at the Akron jail facility in late afternoon on September 1st. Gilbert was read his *Miranda* rights and was advised that Carlson wanted to talk to him about the Gloria Krouse homicide. Gilbert was cooperative but when asked about the crime, he would not respond verbally; rather he would only motion "yes" and "no" by nodding or shaking his head. When Carlson told Gilbert that he believed Gilbert had killed Gloria Krouse, Gilbert nodded his head "yes". He then stated verbally that he would not like to see anyone go to prison for what he did.

The following week, on September 9, 1981 Carlson returned to Toledo to interview Steve Davis and another of Gilbert's friends, Charlie Wilson, with whom Gilbert frequently went fishing. From Davis, Carlson learned that Gilbert often carried a "cut-off" butchers' knife that he tucked into the belt inside his pants.

Wilson took Carlson to the place where he and Gilbert used to go fishing. The fishing spot was approximately 30 feet from where Gloria Krouse's body was found. Wilson told Carlson that after Gloria Krouse's murder, Gilbert would not go back there to fish. Wilson also directed Carlson to the Merchant's Landing Shopping Plaza. Wilson told Carlson that Gilbert frequented the shopping center because the Kroger's store there had a good deli department.

On September 10, 1981, the eight witnesses who had been questioned in the Gloria Krouse case were transported from Erie Township and Toledo to Akron to view a line-up. Thomas Gilbert was one of the line-up participants. After viewing the line-up, one witness, Montana McClanahan, who had previously hesitatingly identified Jordan Sutkiewicz as the suspect, positively identified Gilbert as being the man he saw near Gloria Krouse's car in the Merchant's Landing parking lot on the day she was murdered.

In addition to the line-up, officers interviewed Karen Friedman, Gilbert's girlfriend with whom he lived in Toledo. Ms. Friedman gave officers permission to search her house and garage. The officers were looking for faded blue jeans and dark colored tee-shirts, the clothing witnesses from Merchant's Landing said that the man they saw on July 10, 1981 had been wearing. No such items were found in Ms. Friedman's house. Ms. Friedman told the officers that Gilbert only kept clothing in the house. However, when the officers searched Ms. Friedman's garage, they found bundled up a pair of faded jeans and an olive green colored tee-shirt.

The officers once again returned to Ohio after the Akron line-up to re-interview

584

Thomas Gilbert. This time, Gilbert's lawyer told them that Gilbert would not see them. The Monroe County Sheriffs apparently felt that, without a re-interview of Gilbert, they could do no more on the Krouse case and further investigation into the Krouse murder was abandoned.

## SUTKIEWICZ'S FAILURE TO REGAIN COMPETENCY AND SUBSEQUENT CIVIL COMMITMENT

The foregoing post-arrest investigation activities took place before Sutkiewicz was ever committed for inpatient treatment at the Center for Forensic Psychiatry in October 1981 to regain his competency to stand trial for the murder of Gloria Krouse.

During the 15 months following Sutkiewicz's October 1981 admission the CFP, Sutkiewicz's treatment continued. However, during that time, he was not restored to competency. Accordingly, on January 18, 1983, after reviewing the January 11, 1983 report of CFP examiner Mark Delaney, Judge Taft entered an Order determining Sutkiewicz to be mentally incompetent to stand trial, and further ordering the Prosecuting Attorney to insure that a Petition was filed with the Monroe County Probate Court asserting that Sutkiewicz is a person requiring treatment or meets the criteria for Judicial Admission to a mental health facility. Judge Taft also entered a second Order on January 18, 1983 dismissing the murder charges against Sutkiewicz. The dismissal order provided that the Prosecutor could petition the Court to again file the charges against Sutkiewicz, when and if he regained competency.

The same day that CFP examiner Mark Delaney submitted his final report to Judge Taft (January 11, 1983), Delaney also submitted a Petition/Application for Hospitalization to the Monroe County Probate Court. That Petition, which was filed with the Probate Court on January 14, 1983, was supported by the Physician's Certificates of Dr. Edward C. Siriban and Dr. Lee H. Rome, staff psychiatrists at the Center for Forensic Psychiatry.

Dr. Siriban opined in his Certificate for Sutkiewicz's involuntary commitment that Sutkiewicz was mentally ill and should be civilly committed for treatment at the Center for Forensic Psychiatry because if Sutkiewicz were to be released (1) there was a [l]ikelihood that he might cause injury to others and (2) he demonstrated an inability to attend to his basic physical needs.

Dr. Siriban gave as factual support for his conclusion of likelihood of injury to others, "The patient is currently charged with First Degree Murder and his alleged crime occurred on 7-10-81. He is accused of killing a woman in Monroe County." [See Probate Court Materials, Ex. 3.]

Dr. Rome, likewise, determined Sutkiewicz to be mentally ill and in need of hospitalization for his mental condition. As facts serving as the basis of his determination, Dr. Rome cited CFP, police and court records "which indicate that Sutkiewicz was arrested and charged with the first degree murder of Mrs. Krouse, who had been stabbed many times including in both eyes and her throat slashed." [Probate Court Materials, Ex. 4.]

On January 19, 1983, the day after Circuit Court Judge Taft dismissed the murder charges against Sutkiewicz, a hearing was conducted by Monroe County Probate Judge James Seitz on Mark Delaney's petition for Sutkiewicz's involuntary hospitalization. Attorney John Luchansky was appointed to represent Mr. Sutkiewicz. Both Luchansky and Sutkiewicz were present at the January 19 hearing. An assistant Monroe County Prosecutor was also present and participated in the examination of witnesses at the civil commitment hearing.

During his examination of Mark Delaney, Sutkiewicz's case worker at the CFP who filed the petition for Sutkiewicz's commitment, the assistant prosecutor asked Delaney why he made the statement in his petition that Sutkiewicz could be expected within the near future to intentionally or unintentionally seriously physically injure himself or another person. Delaney responded, "I made that statement based in part on the nature of the criminal charge ... Murder."

When asked about his assertion that Sutkiewicz is unable to attend to his basic physical needs, Delaney responded as follows:

A: Well, in my opinion, the respondent's decree [sic] of deterioration is such that if he were in a setting where—uh—where he would need to independently—uh—make decisions about his physical needs that he would probably not, in my opinion, would not be able to attend to those needs.

Q: Has he exhibited examples of this?

A: Well, at the Forensic Center which is a highly structured environment, the patients are subject to constant surveillance and direction by staff—uh—in terms of arising in the morning, in terms of eating meals, in terms of attending to personal hygiene. So, the respondent has not—uh—avoided these—uh—these activities. However, he,—there have been times when there has been some question about his physical hygiene and—uh—I have been made aware that—that he does need to be prodded and directed to attend to these needs by staff.

[Probate Materials, Ex. 5, pp. 10–11.]

Delaney acknowledged, however, that Sutkiewicz independently did feed himself and did clothe himself. [Ex. 5, p. 12] He further admitted that other than the underlying background of the murder charges against him, Sutkiewicz had never made any attempts to injure any persons in the hospital and had not exhibited any physically aggressive behavior. [Ex. 5, p. 13.]

Dr. Rome also testified at the January 19, 1983 hearing.

[Examination by assistant prosecutor]:

Q: Doctor—uh—based upon your examination, is it your opinion that due to the mental illness it can be expected within the near future that Mr. Sutkiewicz could intentionally or unintentionally seriously physically injury another person?

A: Yes, I do.

Q: And why is that, doctor?

A: Uhm, I base that on—uh—two main factors. Uh, one is the—the charge the respondent was being held for at the Forensic Center. The second is his total lack of insight into his illness and into his aggressive impulses.

\*   \*   \*   \*   \*   \*

[Cross–Examination by Mr. Luchansky]

Q: Uhm, doctor, you spoke about his aggressive impulses as far as the likelihood of injury to others together with the background information provided by the police report. I would like you to center basically on the aggressive impulses that you observed or were able to recite other than the police report as far as the aggressiveness of this individual?

A: I did not observe any aggressive acting out or—nor did—were any threats made towards me by the respondent. . . . So my answer is no.

Q: Were you able to find other than in the police report any instances of aggressive behavior?

A: Other than the police report for—for the—current—the just current charge?

Q: The—the one that is—was the ... underlying reason for the commitment to the Center for Forensic Psychiatry.

A: There is—there are a number of other clinical reports in the files—uhm—from a hospital in Maryland, Perkins Hospital, if I'm not mistaken—uhm—that were dated 1977. . . .

Q: Over five years ago?

A: That was over five years ago.

[Ex. 5, pp. 17–20].

Based upon the hearing testimony and the Physicians' Certificate statements, Judge Seitz entered an order committing Sutkiewicz for hospitalization at the CFP for a period not to exceed 60 days. [See Ex. 6]

On March 9, 1983, Judge Seitz, converted the 60–day commitment order to one of "indefinite" commitment finding,

By clear and convincing evidence, the individual continues to be a person requiring treatment because the individual is mentally ill, and as a result of that mental illness:

—can be reasonably expected within the near future to intentionally or unintentionally seriously physically injure self or others, and has engaged in an act or acts or

made significant threats that are substantially supportive of the expectation [and]—whose judgment is so impaired the individual is unable to understand the need for treatment. Continued behavior as the result of this mental illness can reasonably be expected, on the basis of competent medical opinion, to result in significant physical harm to self or others.

[Probate Materials, Ex. 9.]

The basis for the Court's finding was the February 28, 1983 opinion of Dr. Edward Siriban who stated in his February 28 Certificate that the factual basis for his determination of Sutkiewicz's likelihood of injuring others was that "The patient was charged with First Degree Murder which occurred on 7–10–81. He is accused of killing a woman in Monroe County." [Ex. 8.]

Sutkiewicz remained in the Center for Forensic Psychiatry for approximately nine years, until June 1991. Sutkiewicz's civil commitment was reviewed approximately every six months. From January 19, 1983 through early 1991, Sutkiewicz had 13 separate hearings which resulted from his petitions for discharge or transfer combined with periodic CFP review reports. A Monroe County Assistant Prosecutor was present and participated in each of those hearings.

In connection with these review/discharge hearings, four different psychiatrists and four psychologists examined Sutkiewicz[6] and then wrote reports and/or testified regarding Sutkiewicz's need for continued involuntary hospitalization. Based upon the reports and/or testimony of the various psychiatrists and psychologists, three different probate judges determined that Sutkiewicz needed continued involuntary hospitalization at the Center for Forensic Psychiatry.

In the reports and testimony of the doctors upon which the probate court relied in ordering Sutkiewicz's continued hospitalization at the CFP, all of the psychiatrists and psychologists opined that they believed Sutkiewicz needed continued hospitalization at the Center for Forensic Psychiatry for two reasons: (1) they believed Sutkiewicz could be expected to seriously physically injure another person and (2) they believed him to be unable to attend to basic physical needs.

With respect to the factual basis given for the belief that Sutkiewicz might seriously physically injure other persons, virtually all of the doctors pointed to the fact that he was charged with first-degree murder. *See e.g.*, Probate Materials Ex. 22, May 24, 1985 hearing transcript, testimony of Dr. Edward Siriban:

Q: Uh, do you have any opinion as to whether or not Mr. Sutkiewicz is dangerous to others?

A: Yes, I have.

Q: Could you explain the basis for that opinion?

A: My opinion is based on the—uh—previous charge that Mr. Sutkiewicz was charged with and that was open murder.

Ex. 22, p. 12.

*See also*, Ex. 28, January 21, 1986 hearing transcript, testimony of Mark Delaney:

Q: If it wasn't for the reason why he was referred to the Center for Forensic Psychiatry, meaning the incompetence to stand trial and the charge was open murder, and he was just actively psychotic, would it be possible for him to be a resident of Ypsilanti State Regional Hospital?

A: Yes.

Q: So basically its the fear that as a result of the—the charge that he was charged with and never convicted of by the way, that you feel that [Sutkiewicz needs] the Center for Forensic Psychiatry, needs that more structured environment?

A: Yes, that's my opinion.

Ex. 28, p. 11. *See also* transcript of Delaney's testimony on May 28, 1987, Ex. 43, pp. 6–7.

By way of further example, *see* October 9, 1986 Certificate and Mental Health Evaluation of Michael W. Naylor, M.D. [Exhibits 35 and 36] (Facts supporting belief of likelihood of injury to others: "Patient alleged to have

---

**6.** Six of these professionals were chosen by Sutkiewicz's lawyer to perform independent psychiatric or psychological examinations of Sutkiewicz.

killed woman in very bizzare [sic] fashion. Much evidence to support charge. Pt. grossly psychotic at time of murder."); November 1989 report of Gerald J. Briskin, PhD [Ex. 56] ("At the present time, [Sutkiewicz] seems to be in partial remission.... Individuals with this condition have been released from mental hospitals and placed in community after care. However, in this instance, while psychotic, this individual did commit a particularly violent crime for no apparent reason...."); November 27, 1989 testimony of Dr. Lee H. Rome [Ex. 57, p. 12] ("[Sutkiewicz] himself has told me that at times he just—uh—eloped from unstructured treatment settings. So that's another factor to look at in terms of potential for future violence because certainly off of medication in an unstructured kind of setting—uh—would place him—especially looking at the charge that never went to trial would—would be important risk factors to look at.") [7]

All of the doctors, however, repeatedly stated that during his entire nine-year hospitalization, Sutkiewicz had not demonstrated any assaultive behavior, nor had he ever threatened anyone at the CFP with bodily harm.

Based upon the doctors' repeated determinations that Sutkiewicz might likely injure others and might neglect his own physical needs, Sutkiewicz continued to be determined by the probate court to be mentally ill and in need of continued hospitalization at the Center for Forensic Psychiatry until early 1991, when physicians at the CFP, after changing Sutkiewicz's medication, determined that his mental state was greatly improved.

On March 4, 1991, Forensic Center examiner Barbara O'Neal determined that Sutkiewicz had become competent to stand trial. Ms. O'Neal contacted the new Monroe County Prosecutor, William Frey, and informed him of Sutkiewicz's competency. Prosecutor Frey advised Ms. O'Neal that he was not going to reinstate the homicide charges.

In June 1991, Sutkiewicz was transferred from the Forensic Center to a group home in Brighton, Michigan. However, approximately one and one-half months later, the house manager of the group home, Robert Garfield, filed a petition for Sutkiewicz's re-hospitalization relating that Sutkiewicz had recently returned to the house under the influence of glue and was in possession of unopened tubes of glue. He also had glue on his face, hair, and nostrils. Garfield, therefore, opined that he believed Sutkiewicz could reasonably be expected to injure himself or others if not hospitalized.

Before the probate court could act on Mr. Garfield's petition, an incident occurred in which Sutkiewicz jumped from a second story window at the house. This conduct led to his transfer from the group home to Northville Regional Hospital. Sutkiewicz left Northville unauthorized several times. In November 1991 he left again and was not seen for the ensuing 21 months until finally being located in August 1993 living in the Pontiac Rescue Mission.

## III. *DISCUSSION*

Although Defendants acknowledge that they participated in the initiation of criminal proceedings against Jordan Mark Sutkiewicz, they contend that because they did not participate or assist in the civil commitment of Mr. Sutkiewicz in January 1983, they cannot be deemed to have "caused" any damages suffered by Plaintiff after that date. Therefore, they ask the Court to preclude Plaintiff from offering evidence of any damages after January 19, 1983. They argue that Plaintiff remained in the CFP after that date only pursuant to orders regularly entered by judges of the Monroe County Probate Court, and contend that these orders were the sole

---

7. Dr. Rome further testified as follows:

    Q: Barring the fact if you had not had this murder in 1981, where [would] you be in your treatment of Mr. Sutkiewicz at this point?
    A: In terms of medically, probably right where we are now. * * * I wouldn't see any differences. In terms of where—where I would be in recommending—where my recommendation would be focused on regarding the setting of treatment, yes. That—that's where the difference would be. I would see Mr. Sutkiewicz—uh—I think I'd feel much more comfortable in recommending a less restrictive placement.
    Ex. 57, pp. 22–23.

proximate cause of Plaintiff's detention at the CFP.

In support of their argument, Defendants rely principally upon *Houston v. Humboldt County*, 561 F.Supp. 1124 (D.Nev.1988), *aff'd*, 725 F.2d 516 (9th Cir.1984), and other Ninth Circuit cases discussed therein.

In *Houston*, a Mexican citizen was detained in the Humboldt County jail for over a year as a material witness to a first degree murder offense. His detention by judicial commitment was reviewed three times. After release on a writ of habeas corpus, he sued the non-judicial state officials involved in his detention for violation of civil rights and for false arrest and imprisonment. The trial court dismissed the plaintiff's claims explaining,

> In order to state a claim for relief against the remaining state defendants for unlawful confinement, plaintiff must show, among other things, that the wrongful conduct of these defendants was the proximate cause of his detention.
>
> *　　*　　*　　*　　*　　*
>
> [T]he detention of plaintiff for approximately six days between his arrest on July 4, 1980 and his commitment by a magistrate on July 11, 1980 was unlawful, barring exceptional circumstances which do not appear in the record before the Court. After the hearing before the magistrate on July 11, 1980, his [the magistrate's] decision was an intervening and supervening efficient proximate cause of plaintiff's detention which in effect immunized the defendants from further responsibility.

In *Hoffman v. Halden*, 268 F.2d 280 (9th Cir.1959) (overruled in part on other issues, *Cohen v. Norris*, 300 F.2d 24 (9th Cir.1962), the Court said:

> There are various cases which point out that certain acts preliminary to judicial decision or action can not be the basis for a claim under the Civil Rights statutes. These cases are essentially cases on proximate causation.
>
> *　　*　　*　　*　　*　　*
>
> With these cases in mind we would reason as follows: In a Civil Rights conspiracy case, the injury and damage must flow from the overt acts. Where the gravamen of the injury complained of is commitment to an institution by court order, this order of the court, right or wrong, is ordinarily the *proximate cause* of the injury. Various preliminary steps occur before the order is made. These preliminary steps may range from such patters as filing of petitions to the various clerical and procedural activities which lead to the order. In the ordinary case, the order is made after a hearing in court or after consideration by the court of the supporting documents and evidence. Therefore, the various preliminary steps would not cause damage unless they could be said to be the proximate cause of the injury. In the usual case, the order of the court would be the proximate cause and the various preliminary steps would be remote causes of any injury from imprisonment or restraint under the court order.
>
> We are not saying that there could not be situations where a judge was so deceived and hoodwinked by proceedings brought before him that certain of these preliminary acts might not raise themselves to the status of a proximate cause of an injury, notwithstanding the intervening order of the court. There might be situations where the action of the court became in substance, merely a conduit for the wrongful action which preceded.

561 F.Supp. at 1126–1127.

The court then went on to discuss in detail the causation requirement:

> The importance of identifying the true proximate cause of the deprivation in a civil rights case was recently emphasized in the case of *Arnold v. International Business Machines Corporation*, 637 F.2d 1350 (9th Cir.1981), where the court observed:
>
> > The causation requirement of sections 1983 and 1986 is not satisfied by a showing of mere causation in fact. Rather, the plaintiff must establish proximate or legal causation. In *Hoffman v. Halden*,

[*supra*], we examined the allegations of a deprivation of civil rights arising out of the plaintiff's commitment to a mental institution by court order. We observed that the proximate cause of the plaintiff's injury would ordinarily be the court order, and not the various steps preliminary to the court order. Without the preliminary steps, no court order could have issued, and no commitment could have occurred. Thus, the preliminary steps were a cause in fact of the commitment. Because the defendants in the case were persons involved in those preliminary steps, we had to determine, in reviewing the trial court's dismissal for failure to state a cause of action, whether the plaintiff had alleged facts sufficient to raise those preliminary steps to the level of proximate cause.

*Id.* at 1127–1128 (citations omitted).

The specific acts involved in the *Hoffman* case discussed in *Arnold* and *Houston, supra,* included the defendant-county health officials' suppressing of information from the authorities and the providing of allegedly erroneous information which the examining physician relied upon in determining that Hoffman was mentally ill and in need of hospitalization. The court found that these preliminary acts constituted sufficient proximate cause so as to preclude the "lack of causation" summary dismissal sought by the defendants.

Similarly, in *Dick v. Watonwan County,* 562 F.Supp. 1083 (D.Minn.1983), two social workers, Deborah Hunter and Jerry Ruppert, and their supervisor, Bill Schutt, were sued by Alexander and Irene Dick for violation of their civil rights predicated upon their involuntary commitment to a medical facility for alcohol detoxification. Hunter and Ruppert had obtained information regarding the Dicks' alleged alcoholism from the Dicks' minor daughter, Valerie. Without verifying any of the information given to them by the minor child, Hunter and Ruppert had the county attorney petition the probate court for an order involuntarily committing Mr. and Mrs. Dick for alcohol detoxification. The probate court thereafter entered commitment orders based upon the information provided to the county attorney by the social workers, and the Dicks were subsequently arrested and taken to the detoxification facility.

The Dicks later sued for deprivation of their civil rights. The social workers defended arguing that they did not "cause" the Dicks' alleged deprivation of civil rights. They argued that it was the probate court's order that was the proximate cause of the Dicks' injury. The case was tried to a jury and the jury returned a verdict awarding the Dicks' $507,000 in damages. The social workers' moved for judgment notwithstanding the verdict.

In affirming the jury's liability determination, the court found that the Dicks' case presented precisely the type of situation which the court in *Hoffman v. Halden, supra,* referred to when it said that there might be situations where certain preliminary acts can raise themselves to the status of proximate cause. The *Dick* court explained:

> The Court also finds that Judge Teigum's orders, given the circumstances, under which they were procured, did not break the causal chain.

>       *     *     *     *     *     *

> The Eighth Circuit has ruled in *Ames v. United States,* 600 F.2d 183, 185 (8th Cir. 1979), that situations involving the presentation of false evidence or the withholding of evidence are exceptions to the general rule that a grand jury indictment, or as in this case, a court order, breaks the chain of causation. *See also,* Restatement (Second) of Torts, § 653 (1977); W. Prosser, The Law of Torts, 836–37 (4th ed. 1971). Both of these elements are present here. Judge Teigum had no information available to him other than that contained in the commitment petitions signed under oath by Hunter. But as detailed above, the petitions contained glaring inaccuracies including the false statement that Irene Dick, while wielding a knife, had recently threatened to murder her husband. This inaccuracy was especially damaging since the Judge was required to make a finding of "probable dangerousness" before ordering the Dicks confined.... While Hunter and

Ruppert may not have known that this statement was false, *Ames* does not expressly require such knowledge.... Hunter and Ruppert were also guilty of withholding evidence in the sense that, although they had a legal duty to make at least a reasonable effort to obtain physician's statements—statements which, if obtained, almost certainly would have exonerated the Dicks—the failed to make any effort to procure the statements beyond asking Valerie if she knew the name of her parents' physician.

\* \* \* \* \* \*

Under these circumstances, the existence of court orders does not absolve Hunter and Ruppert from liability. Public officials who act in bad faith cannot be allowed to escape liability on the theory that higher officials ratified their conduct. Sanctioning such a defense would be an invitation to anarchy. In this case, the jury properly concluded that the defendants proximately caused the violation of the Dicks' constitutional rights.

562 F.Supp. at 1100–1101.

Defendants in this case contend that they "played absolutely no role" in the civil commitment proceedings. Their position is that Sutkiewicz's initial and continued civil commitment at the CFP was based upon the recommendation of various social workers, CFP physicians, and numerous independent medical examiners retained by Sutkiewicz's attorney, and their initiation of criminal charges against him had nothing to do with Sutkiewicz's commitment.

However, Plaintiff has submitted the Affidavit of Gerald Briskin, PhD, one of the independent psychologists who evaluated Mr. Sutkiewicz during his hospitalization at the CFP in 1989. Dr. Briskin states in his Affidavit that at the time that he examined Mr. Sutkiewicz and found himself unable to recommend Sutkiewicz for transfer to a lesser restrictive facility, he "was very much influenced by the belief that probable cause existed to believe that Mr. Sutkiewicz did kill and murder Gloria Krouse." [Briskin Affidavit,

para. 6]. Dr. Briskin further opines that had Mr. Sutkiewicz "not been stigmatized by the murder charge and the belief that there existed probable cause that he did commit this murder, ... he would not have been detained at the Center for Forensic Psychiatry." *Id.* at para. 7.

As discussed *supra*, the murder charge overshadowed the fact that, during his entire nine-year confinement, Mr. Sutkiewicz never assaulted anybody, was never a danger to the staff, never a danger to another person, and made no attempts to commit suicide or do bodily injury.

As Plaintiff points out in his Response Brief, the Monroe County prosecutor's office was present at every single civil commitment hearing, and rebutted Sutkiewicz's attorney's repeated arguments seeking Sutkiewicz's discharge or transfer. No one ever came forward with information indicating that Mr. Sutkiewicz might not be the perpetrator of the Krouse murder.

This Court has already held that a material issue of fact exists as to whether the Defendants conveyed to the prosecutors the information they obtained after Sutkiewicz's arrest regarding Thomas Gilbert's possible role in the Krouse murder, and if they ever did convey such information, an issue remains as to when they did so.

As the Michigan Supreme Court stated in *Grimes v. Bowerman,* 92 Mich. 258, 52 N.W. 751 (1892):

Where a Plaintiff has been injured in his person or property by the wrongful act of Defendant, the fact that a third party by his wrong contributed to the injury does not relieve the Defendant from liability, and while the culpable act of a third person may be the immediate cause of the injury, still an earlier wrongful act may have contributed so effectually to it as to be regarded as the efficient, or, at least, concurrent and responsible cause.

*Id.* at 265–266, 52 N.W. 751.[8]

*See also,* Restatement (Second) of Torts § 439:

Instructions. SJI2d 15.03 provides:

8. The premise enunciated by the court in *Grimes* is now embodied in the Michigan Standard Jury

If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's innocent, tortious, or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability.

Inasmuch as the Court has found that it must be left for proofs at trial whether the Defendants conveyed potentially exculpatory information to the prosecutors, the Court also finds that, it must also be left for the jury to say, based upon expert and other testimony and proofs, whether Plaintiff's continued commitment to the CFP, as opposed to release or transfer which could have followed in the absence of a murder charge, would have been the result even if the doctors were aware that there was evidence to suggest that Sutkiewicz might not have committed the crime with which he had been charged in 1981.

As both the Michigan and the federal court have held, a defendant remains responsible for all of the injurious consequences of his conduct "which occurred, naturally and directly" from his conduct. *Davis v. Thornton,* 384 Mich. 138, 180 N.W.2d 11 (1970). *See also, Arnold v. International Business Machines Corp., supra,* ("The requisite causal connection [required in § 1983 actions] can be established not only by some kind of direct personal participation in the deprivation, but also *by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.*" 637 F.2d at 1355 (emphasis added).)

Where, in fact, that series of events serves as the premising point for judicial action, the Court would be hard-pressed to find that the judicial action absolves the actor who sets the series of acts in motion from liability.

Section 442A of the Restatement (Second) of Torts phrases the rule as follows:

Where the negligent conduct of the actor creates or increases the foreseeable risk of

harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding cause.

Judges do not make decisions in vacuums. In this case, the probate judges who entered the orders determining Jordan Sutkiewicz to be mentally ill and committing him (and continuing his commitment) to the Center for Forensic Psychiatry relied upon the opinions of psychiatric experts. As shown, *supra,* however, these experts' opinions were all premised upon the fact that they were of the belief that there remained pending first degree murder charges against Sutkiewicz. At every continuing commitment hearing, these experts repeatedly referred to the murder charge as a basis for believing he presented a danger to others. There is no dispute that the Defendant officers caused the charges to be filed against Sutkiewicz. Their actions, thus, "set in motion a series of acts" leading to the entry of the court orders committing Sutkiewicz to the Center for Forensic Psychiatry.

Although the Court is convinced, based upon the probate records, that Sutkiewicz was delusional and most likely in need of psychiatric treatment, in light of the fact that all of the experts conceded that Sutkiewicz had not, otherwise, demonstrated any violent behavior, the Court cannot say that, if the doctors and the probate court were provided with information that Sutkiewicz might not have committed the murder with which he had been charged they would have, nonetheless, recommended and ordered his continued commitment at the CFP.

### IV. *CONCLUSION*

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant's "Motion *in Limine* to Exclude or Limit Evidence, Testimony and/or Argument Concerning Damages" as supplemented, pursuant to the Court's instruction, by Defendants' March 28, 1993 "Motion for Partial Summary Judgment/Motion *in Limine* Re-

---

There may be more than one proximate cause. To be a proximate cause, the claimed negligence need not be the only cause nor the last

cause. A cause may be proximate although it and another cause act at the same time or in combination to produce the occurrence.

garding Proximate Cause", be and hereby is DENIED.